J-A22027-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| TRIANGLE HOME INVEST, LLC AND HOWARD M. DUNETZ | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| v. | |
| KAHEEL COMPANY, LLC, HERBERT J. TOY A/K/A HERBERT JOHN TOY A/K/A HERBERT JOHN TOY, III, JABRIER COMPANY, LLC AND TERREY MANAGEMENT, CO., INC. | |
| APPEAL OF: KAHEEL COMPANY, LLC AND HERBERT J. TOY A/K/A HERBERT JOHN TOY A/K/A HERBERT JOHN TOY, III | |
| | No. 898 EDA 2017 |

Appeal from the Judgment Entered March 28, 2017
In the Court of Common Pleas of Lehigh County
Civil Division at No(s): 2012-C-1107

BEFORE:  BOWES, J., LAZARUS, J., and PLATT, J.[*]

MEMORANDUM BY LAZARUS, J.:               **FILED NOVEMBER 13, 2017**

Kaheel Company, LLC, et al. ("Kaheel Company") appeals from the judgment, entered in the Court of Common Pleas of Lehigh County, in favor of Triangle Home Invest, LLC ("Triangle Home") on Count Two-Unjust Enrichment, Count Three-Intentional and Fraudulent Misrepresentation, and

_____

[*] Retired Senior Judge assigned to the Superior Court.

Count Six-Conversion, in the amount of $289,000.00.[1]  After careful review,

we affirm on the basis of the well-reasoned opinion of the Honorable Michele

A. Varricchio.  **See** Trial Court Opinion, 12/22/16, at 1-42.

In her Pa.R.A.P. 1925(b) opinion, Judge Varricchio set forth the relevant

factual and procedural background of this incredibly complicated and unusual

case, which we adopt for the purpose of this appeal.

Triangle Home raises the following issues on appeal:

1. [Triangle Home] failed to prove by clear and convincing evidence that [Kaheel Company] made representations of existing facts which were untrue and upon which [Triangle Home] justifiably relied.

2. [Triangle Home] failed to prove by a fair preponderance of the evidence that Kaheel was undercapitalized; that it failed to adhere to corporate formalities; that it and Toy substantially intermingled corporate and personal affairs; or that the corporate form was used to perpetuate fraud.

Brief of Appellant, at 4.

Our appellate role in cases arising from non-jury trial verdicts is to determine whether the findings of the trial court are supported by competent evidence and whether the trial court committed error in any application of the law. The findings of fact of the trial judge must be given the same weight and effect on appeal as the verdict of a jury. We consider the evidence in a light most favorable to the verdict winner. We will reverse the trial court only if its findings of fact are not supported by competent evidence in the record or if its findings are premised on an error of law. However, where the issue . . . concerns a question of law, our scope of review is plenary.

---

[1] The trial court found in favor of Kaheel Company on Count One-Breach of Contract and Count Five-Negligence and dismissed Count Four-Fraud as duplicative.

- 2 -

The trial court's conclusions of law on appeal originating from a non-jury trial are not binding on an appellate court because it is the appellate court's duty to determine if the trial court correctly applied the law to the facts of the case.

*Wyatt Inc. v. Citizens Bank of Pennsylvania*, 976 A.2d 557, 564 (Pa. Super. 2009) (citing *Wilson v. Transp. Ins. Co.*, 889 A.2d 563, 568 (Pa. Super. 2005)) (citations and quotations omitted).

Instantly, the trial court rendered a verdict in favor of Triangle Home on the counts of unjust enrichment, intentional and fraudulent misrepresentation, and conversion. The elements of unjust enrichment are

benefits conferred on defendant by plaintiff, appreciation of such benefits by defendant, and acceptance and retention of such benefits under such circumstances that it would be inequitable for defendant to retain the benefit without payment of value. The most significant element of the doctrine is whether the enrichment of the defendant is unjust; the doctrine does not apply simply because the defendant may have benefited as a result of the actions of the plaintiff.

*Northeast Fence & Iron Works, Inc. v. Murphy Quigley Co., Inc.*, 933 A.2d 664, 670 (Pa. Super. 2007) (citation omitted). Here, the trial court found Kaheel Company had (1) been enriched by $237,500.00 by retaining funds tendered to it by Triangle Home and failing to make interest payments and complying with the terms of acknowledgement agreed upon by the two parties, and (2) appreciated the benefit of being able to pay for its operating and business expenses with the investment from Triangle.[2] The trial court

_____

[2] Triangle Home sustained further losses in the amount of $52,500.00 from the non-payment of quarterly interest payments. Thus, the trial court entered

correctly determined it would be inequitable for Kaheel Company to accept and retain benefits from Triangle Home's investment without reciprocal payment of value. **Northeast Fence and Ironworks, Inc.**, **supra**.

Next, the trial court found Kaheel Company liable for intentional misrepresentation. In **Bortz v. Noon**, 729 A.2d 555 (Pa. 1999), our Supreme Court held that the elements of intentional misrepresentation are:

(1) A representation;

(2) which is material to the transaction at hand;

(3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false;

(4) with the intent of misleading another into relying on it;

(5) justifiable reliance on the misrepresentation; and,

(6) the resulting injury was proximately caused by the reliance.

**Bortz**, 729 A.2d at 560. Kaheel Company purported to have silent partners who had contributed between $650,000.00 and $750,000.00, which the trial court found was untrue. Accordingly, the trial court correctly determined this constituted a material misrepresentation that induced Triangle Home to invest $250,000.00 in Kaheel Company's real estate venture.

Lastly,

[c]onversion is a tort by which the defendant deprives the plaintiff of his right to a chattel or interferes with the plaintiff's use or possession of a chattel without the plaintiff's consent and without

_____

a verdict in the amount of $289,000.00 in favor of Triangle and against Kaheel Company and Herbert Toy.

lawful justification.  A plaintiff has a cause of action in conversion if he or she had actual or constructive possession of a chattel at the time of the alleged conversion.  Money may be the subject of conversion.  However, the failure to pay a debt is not conversion.

***Pittsburgh Construction Co. v. Griffith***, 834 A.2d 572, 581-82 (Pa. Super. 2003) (quotations and citations omitted).  The trial court correctly determined that an agent of Kaheel Company took as a personal draw $16,457.65 from an account in which Triangle had an ownership interest.[3]  The trial court found this constituted a conversion of Triangle's investment funds.  ***Pittsburgh Construction Co.***, ***supra***.  We agree.

After reviewing the parties' briefs, the record, and the relevant case law, we conclude that Judge Varricchio's well-reasoned opinion thoroughly and properly disposes of the questions Kaheel Company raises on appeal. Accordingly, we affirm on the basis of Judge Varricchio's opinion.  We direct the parties to attach a copy of the opinion in the event of further proceedings.

Judgment affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 11/13/2017

---

[3] The total verdict owed to Triangle Home is $289,000.00, of which Terrey Management Co, Inc. is jointly and severally liable for $16,457.65.

FILED 12/22/2016 1:36:52 PM, Clerk of Judicial Records, Civil Division, Lehigh County, PA
2012-C-1107    /s/l S

# IN THE COURT OF COMMON PLEAS OF LEHIGH COUNTY, PENNSYLVANIA
## CIVIL DIVISION

| | |
|---|---|
| TRIANGLE HOME INVEST, LLC and HOWARD M. DUNETZ, <br>       Plaintiffs <br><br> vs. <br><br> KAHEEL COMPANY, LLC, HERBERT J. TOY a/k/a HERBERT JOHN TOY a/k/a HERBERT JOHN TOY, III, THE JABRIER COMPANY, LLC, a/k/a JABRIER COMPANY, LLC and TERREY PROPERTY MANAGEMENT, CO., <br>       Defendants | No. 2012-C-1107 <br><br><br> CIVIL <br><br><br><br><br><br> ASSIGNED TO: <br> The Honorable Michele A. Varricchio |

## Non-Jury Verdict

AND NOW, this 22ND day of December 2016, upon consideration of the credible, relevant, and admissible evidence introduced during the non-jury trial held August 13, 2015, and October 22, 2015, attended by Plaintiffs, Howard M. Dunetz and Triangle Home Invest, LLC and their legal counsel, Stephen M. Hladick, Esquire and Pamela L. Cunningham, Esquire and Defendants, Herbert J. Toy a/k/a Herbert John Toy a/k/a Herbert John Toy, III, Kaheel Company, LLC, The Jabrier Company, LLC a/k/a Jabrier Company, LLC and Terrey Property Management Company and their legal counsel Michael C. Deschler, Esquire; and the joint stipulations of fact submitted by the parties, and based upon the findings of fact and conclusions of law set forth in the Decision entered this same date, it is hereby ORDERED and DECREED that this Court enters a verdict on the Complaint as follows:

(1) On Count I, Breach of Contract, we find in favor of Defendants, Kaheel Company, LLC, Herbert J. Toy a/k/a Herbert John Toy a/k/a Herbert John Toy, III, and Terrey Property Management, Co. in the amount of $0.00 against Plaintiff, Triangle Home Invest, LLC, and Howard M. Dunetz in accordance with the following opinion.

1

(2) On Count II, Unjust Enrichment, we find in favor of Plaintiff, Triangle Home Invest, LLC, in the amount of $237,000.00 against Defendants, Kaheel Company, LLC, and Herbert J. Toy a/k/a Herbert John Toy a/k/a Herbert John Toy, III, in accordance with the following opinion. We find in favor of Defendant, Terrey Property Management, Co., in the amount of $0.00 against Plaintiff, Triangle Home Invest, LLC. We find in favor of all Defendants in the amount of $0.00 against Plaintiff, Howard M. Dunetz, on Count II.

(3) On Count III, Intentional and Fraudulent Misrepresentation, we find in favor of Plaintiff, Triangle Home Invest, LLC, in the amount of $289,000.00 against Defendants, Kaheel Company, LLC, and Herbert J. Toy a/k/a Herbert John Toy a/k/a Herbert John Toy, III, in accordance with the following opinion. We find in favor of Defendant, Terry Property Management, Co., in the amount of $0.00 against Plaintiff, Triangle Home Invest, LLC. We find in favor of all Defendants against Plaintiff, Howard M. Dunetz, on Count III.

(4) Count IV, Fraud is hereby DISMISSED in accordance with the following opinion.

(5) On Count V, Negligence, we find in favor of Defendants, Kaheel Company, LLC, Herbert J. Toy a/k/a Herbert John Toy a/k/a Herbert John Toy, III, and Terrey Property Management Company, LLC, in the amount of $0.00 against Plaintiff, Triangle Home Invest, LLC, and Plaintiff, Howard M. Dunetz, in accordance with the following opinion.

(6) On Count VI, Conversion, we find in favor of Plaintiff, Triangle Home Invest, LLC, in the amount of $16,457.65 against Defendants, Herbert J. Toy a/k/a Herbert John Toy a/k/a Herbert John Toy, III, and Terrey Property Management Company, in

2

accordance with the following opinion. We find in favor of Defendant, Kaheel Company, LLC, in the amount of $0.00 against Plaintiff, Triangle Home Invest, LLC. We find in favor of all Defendants in the amount of $0.00 against Plaintiff, Howard M. Dunetz.

(7) Plaintiff, Triangle Home Invest, LLC, is entitled to a total recovery of $289,000.00. Accordingly, any amounts recovered by Plaintiff, Triangle Home Invest, LLC, on any one Count shall be credited against any amount due under other Counts where recovery was granted.

BY THE COURT:

Michele A. Varricchio, J.

3

IN THE COURT OF COMMON PLEAS OF LEHIGH COUNTY, PENNSYLVANIA
CIVIL DIVISION

TRIANGLE HOME INVEST, LLC and ) No. 2012-C-1107
HOWARD M. DUNETZ, )
· Plaintiffs )
)
vs. ) CIVIL
)
KAHEEL COMPANY, LLC, HERBERT J. )
TOY a/k/a HERBERT JOHN TOY a/k/a )
HERBERT JOHN TOY, III, THE JABRIER )
COMPANY, LLC, a/k/a JABRIER )
COMPANY, LLC and TERREY )
PROPERTY MANAGEMENT, CO., ) ASSIGNED TO:
Defendants · ) The Honorable Michele A. Varricchio

\*\*\*\*\*\*\*\*\*\*

Appearances:

Stephen M. Hladik, Esq.
William E. Miller, Esq.
Ronald E. Corkery, Esq.
Pamela Cunningham, Esq.
For Plaintiffs

Michael C. Deschler, Esq.
For Defendants

\*\*\*\*\*\*\*\*\*

## Non-Jury Decision Pursuant to Pa.R.C.P. 1038

MICHELE A. VARRICCHIO, Judge

This case arises out of a $250,000.00 investment that Plaintiff Triangle Home Invest, LLC made to Defendant, Kaheel Company, LLC, on April 1, 2010, for the purpose of the purchase of residential properties to "flip" and sell, with a percentage of the profits to be returned to Plaintiff Triangle Home Invest, LLC. Plaintiffs allege that the other Defendants are shell companies through which Defendant, Herbert J. Toy, operated a real estate investment scheme designed to preclude profits due Plaintiffs. Additionally, Plaintiffs claim that of the original $250,000.00 investment, Plaintiffs only recouped $12,500.00 and argue that Plaintiffs are owed,

4

at a minimum, the return of the remainder of the investment of $235,000.00. In accordance with the verdict entered this same date, this Court enters the following decision.

## PROCEDURAL HISTORY

On March 16, 2012, Plaintiffs, Howard M. Dunetz (Dunetz), sole member of Triangle Home Invest, LLC, and Triangle Home Invest LLC (Triangle), initiated this action against Defendants, Kaheel Company, LLC (Kaheel), Herbert J. Toy (Toy), also known as Herbert John Toy, also known as Herbert John Toy III, The Jabrier Company LLC (Jabrier), also known as Jabrier Company LLC, also known as Jabrier Company, LLC, and Terrey Property Management Company, Inc. (Terrey) and an additional Defendant, Duggan Real Estate Investment, LLC, seeking damages in excess of $235,000.00. By Order of Court dated September 24, 2012, the Honorable William E. Ford sustained Defendants' Preliminary Objections to the Complaint and the Complaint was stricken with leave to amend with substantial revisions within 20 days of the Order. Plaintiffs filed an Amended Complaint on October 23, 2012. On November 19, 2012, Plaintiffs filed a Second Amended Complaint. By Order of Court dated January 3, 2013, the additional Defendant, Duggan Real Estate Investments, LLC, was dismissed as a party by stipulation from this matter.

On February 13, 2013, Plaintiffs filed a Third Amended Complaint, the instant Complaint in this matter. In their Third Amended Complaint, Plaintiffs have included six counts: Count I, Breach of Contract, Count II, Unjust Enrichment, Count III, Intentional and Fraudulent Misrepresentation, Count IV, Fraud, Count V, Negligence, and Count VI, Conversion, whereby, "the Plaintiffs demand judgment against Defendants in a sum exceeding $235,000.00, plus interest, fees, costs, attorneys' fees and such other relief as the Court deems just and equitable." See Pl.'s Third Amend. Compl. After argument held March 18, 2013, this Court overruled

5

Defendants' Preliminary Objections to the Third Amended Complaint by Order of Court dated

March 19, 2013, and Defendants were Ordered to file an Answer within twenty days.

Defendants filed an Answer with New Matter on April 9, 2013, alleging that:

> Dunetz did not lend any money to any of the Defendants and was only involved as a member/representative of the remaining Plaintiff, Triangle.  Dunetz individually is not entitled to any money or any payment from any of the Defendants.  Toy spoke to the Plaintiffs only in his representative capacity as a member of Kaheel and not as a representative/member of the two remaining Defendants.  Toy did not speak to either of the Plaintiffs in his individual capacity, but only in his capacity as a member of Kaheel. Only Triangle lent money to Kaheel and not to any of the remaining Defendants. **This was a loan not an investment.** The Defendants Toy, Jabrier and Terrey did not receive any funds from either Plaintiff and did not make any representations or promises to either Plaintiff and have no liability to either Plaintiff. The oral Agreement for financing was solely between Triangle and Kaheel and was as follows:
>
>> The $250,000.00 was a 20 year loan with interest calculated at the rate of four (4%) percent per annum, interest only payable quarterly with the principle of $250,000.00 due at the end of the 20 year term. There was to be no security or mortgage to be placed on any properties and Kaheel would be able to utilize the funds to finance real estate purchases, renovations, sales, etc.
>
> Kaheel fulfilled all of its obligations under the terms of the oral lending Agreement and did not breach the same.  Kaheel stopped making quarterly interest payments to Triangle after Plaintiffs appropriated property rights of Defendants, made demands for payment of principal and other inappropriate actions.

Defs.' Ans., ¶105-112 (emphasis added).  Plaintiffs filed a Reply to the New Matter on April 30,

2013. In their Reply to the New Matter, Plaintiffs alleged that although Defendants attempted to

categorize the $250,000.00 as a loan, Defendant, Herbert J. Toy III, as a member of Kaheel

Company, LLC executed an Acknowledgement of Receipt of Investment Funds that plainly

stated that Triangle Home Invest., LLC was making an investment.  Ans. to New Matter, ¶107.

The acknowledgement read as follows:

> This ACKNOWLEDGEMENT confirms and acknowledges the receipt by Kaheel Company, LLC of the total sum of Two Hundred Fifty Thousand Dollars ($250,000.00) received from Triangle Home Invest, LLC. Kaheel Company, LLC acknowledges that the Two Hundred Fifty Thousand Dollars ($250,000.00)

> received from Triangle Home Invest, LLC is to be utilized by Kaheel Company,
> LLC or its designee/assignee to purchase real property for investment purposes.
> **The terms and conditions of said investment are to be outlined in another
> agreement be[sic.] prepared in the near future. Kaheel Company, LLC
> agrees that it will provide a security interest to Triangle Homes Invest, LLC
> in the appropriate amount invested in any property(ies) which are purchased
> by Kaheel Company, LLC utilizing the funds received as acknowledged
> herein.**

Pl.'s Reply to New Matter, P. 2 (emphasis placed by Plaintiffs). Based upon the

acknowledgement and there being no subsequent written agreement, Plaintiffs argued that they

are seeking the enforcement of the oral contract between Triangle and Kaheel. *Id.*

A case management Order dated May 31, 2013, set the non-jury trial in the matter for

November 19, 2013. However, the case proceeded to a Mediator, Maxwell E. Davison, Esquire

in June of 2013. On October 9, 2013, Plaintiff filed a Motion for Summary Judgment in this

Matter. Defendants filed their Answer to the Motion for Summary Judgment on October 30,

2013. On November 6, 2013, the Defendants filed an Amended Response to Plaintiffs' Motion

for Summary Judgment. After hearing argument on the Motion for Summary Judgment, the

Motion was denied by Order of Court dated December 12, 2013. Defendants had filed a Motion

in Limine to exclude the acknowledgement of receipt of investment funds and Plaintiffs filed an

Answer to the Motion in Limine on December 17, 2013.

Nothing further occurred in the case until March 3, 2015, when Plaintiffs filed a Motion

to Enforce a Settlement or in the alternative to re-open the case. On March 17, 2015, Defendants

filed a Response to the Motion. By Order of Court dated April 8, 2015, the Plaintiffs' Motion

was granted to the extent that the matter was marked opened. On August 12, 2015, Defendants

filed notice of a Chapter 7 bankruptcy filing for the Jabrier Company, LLC at Case No. 15-15732

in the United States Bankruptcy Court Eastern District of Pennsylvania. The case then

7

proceeded to a two-day bench trial before this Court on August 13, 2015 and October 22, 2015.

Parties were then given deadlines for filing joint stipulations of fact and proposed findings of fact

and conclusions of law.

## FINDINGS OF FACT

The Parties in this matter have stipulated to the following material facts and this Court

hereby adopts them as findings of fact:

1. Plaintiff, Triangle Home Invest, LLC ("Triangle"), is a Pennsylvania limited liability company with an address of 1000 Gypsy Hill Road, Lower Gwynedd, PA 19002.
2. Plaintiff, Howard M. Dunetz ("Dunetz"), is an adult individual with an address of 1000 Gypsy Hill Road, Lower Gwynedd, PA 19002.
3. Dunetz is the sole member of Triangle.
4. Defendant, Herbert J. Toy a/k/a Herbert John Toy a/k/a Herbert John Toy, III ("Toy"), is an adult individual with an address of 4180 Wellington Drive, Bethlehem, Pennsylvania 18018.
5. Defendant, Kaheel Co., LLC ("Kaheel"), is a Pennsylvania limited liability company with a registered address located at 739 North New Street, Apartment 1, Bethlehem, Pennsylvania 18018.
6. Kaheel was created on July 19, 2007, and its Pennsylvania Department of State Entity Number is 3743841.
7. Toy is the organizer and sole member of Kaheel.
8. Defendant, The Jabrier Company, LLC ("Jabrier"), is a Pennsylvania limited liability company with a registered address located at 739 North New Street, Apt. 1, Bethlehem, PA 18018.
9. Jabrier was created on December 2, 2004, with a Pennsylvania Department of State Entity Number 3266496.
10. Toy is the organizer, manager, and sole member of Jabrier.
11. Defendant, Terrey Property Management Co., Inc., ("Terrey"), is a Pennsylvania close corporation with a registered address located at 739 N. New Street, Apt. 1, Bethlehem, PA 18018-3959.
12. Terrey was created on November 14, 2005 and Terrey's Pennsylvania Department of State Entity Number is 560118.
13. Toy is the president and sole shareholder of Terrey.
14. Triangle tendered the sum of $250,000.00, on April 1, 2010, via check made payable to Kaheel (the "Check").
15. The Check was signed by Dunetz on behalf of Triangle.
16. The Check was deposited by Toy on April 1, 2010 into Kaheel's checking account.
17. Prior to depositing the Check into Kaheel's checking account, the balance of the account was zero dollars.

8

18. On April 7, 2010, Toy took a $10,000.00 draw out of Kaheel's checking account to himself personally.

19. On April 7, 2010, Toy, on behalf of Kaheel moved $225,000.00 of the $250,000.00 into Kaheel's money market account.

20. Exhibit P-38 is the check ledger for Kaheel's checking account that corresponds with the bank statements listed as Exhibits P-35 through P-37.

21. Exhibit P-42 is the check ledger for Kaheel's money market account that corresponds with the bank statements listed as P-39 through P-41.

22. On April 2, 2010, Toy as member of Kaheel, sent by facsimile to Dunetz an Acknowledgment of Receipt of Investment Funds (the "Acknowledgement").

23. Dunetz received the Acknowledgement on April 2, 2010.

24. Any notation of "HJT3" in both the ledger for Kahcel's checking account and Kaheel's money market account is a draw to Toy personally.

25. Any notation of "M.M." in Kaheel's checking account is a transfer of money from Kaheel's checking account into Kaheel's money market account.

26. Any notation of "S.C." in both the ledger for Kaheel's checking account and Kaheel's money market account is a service charge charged by PNC Bank.

27. Out of the $250,000.00 investment, a total of $12,500.00 has been paid as follows to [Plaintiff Triangle]:

    -$2,500.00 on June 30, 2010, as evidenced by check 103 in Kahcel's checking account ledger and bank statement.

    -$2,500.00 on September 30, 2010, as evidenced by check 127 in Kaheel's checking account ledger and bank statement.

    -$2,500.00 on December 30, 2010, as evidenced by check 153 in Kaheel's checking account ledger and bank statement.

    -$2,500.00 on April 11, 2011, as evidenced by check 201 in Kaheel's checking account ledger and bank statement.

    -$2,500.00 on December 14, 2011, as evidenced by check 281 in Kaheel's checking account ledger and bank statement.

28. Jabrier purchased the following properties utilizing funds from Kaheel's account:

    -434 North Fulton Street, Allentown, Pennsylvania 18104.

    -926 West Chew Street, Allentown, Pennsylvania 18102.

    -5230 Heston Street, Philadelphia, Pennsylvania 19131.

    -3128 Hartsville Street, Philadelphia, Pennsylvania 19134.

29. No properties were ever titled in the name of Kaheel.

Joint Stipulations of Fact, ¶1-29. It is important to note from the outset that the Court finds that

Jabrier's bankruptcy proceeding prevents the Plaintiffs from proceeding against Jabrier at this

time. Jabrier's Chapter 7 bankruptcy was addressed at the outset of the trial and Plaintiffs agreed that, "we are not seeking any type of judgment or relief against Jabrier at this time." See Notes of Testimony (N.T.), 8/13/2015, at 7:19-8:3. Based upon the testimony and evidence presented at trial, the Court makes the following findings of fact:

1. On August 15, 2015 and October 22, 2015, this Court conducted a non-jury trial.

2. At trial, Plaintiff, Dunetz, testified on his behalf and on behalf of Triangle. Defendant, Toy, testified on his behalf and on behalf of Defendants, Kaheel and Terrey.

3. Plaintiffs introduced Exhibits P1-P13, P16-P26, P31-P32, P35-P49, and P59-61 into evidence at trial.

4. Defendants introduced Exhibits P27-28, P30, and D9-D10 into evidence at trial.

THE MEETING OF THE PARTIES

5. After twenty-five years of practicing general dentistry, Dunetz retired in October of 2008. See N.T., 8/13/2015, at 10:15-25.

6. During his retirement, Dunetz became interested in real estate particularly buying and selling real estate. See N.T., 8/13/2015, at 12:2-18.

7. To aid this interest, Dunetz created Triangle Home Invest, LLC as a limited liability company in 2010. See N.T., 8/13/2015, at 12:11-12.

8. In early 2010, Dunetz, through Triangle purchased his first rental property in West Philadelphia. See N.T., 8/13/2015, at 12:15-16.

9. Triangle was funded solely by Dunetz's funds. See N.T., 8/13/2015, at 13:5-11.

10. Prior to forming Triangle, Dunetz began attending meetings of Diversified Investors Group ("DIG"), which is a real estate investment group, in Plymouth Meeting and Fort Washington. See N.T., 8/13/2015, at 13:12-22.

11. DIG is an educational and support group for people interested in real estate investments. See N.T., 8/13/2015, at 13:12-22.

12. DIG provided subgroup meetings. Dunetz began attending subgroup meetings in 2010, including one on "flipping houses" by buying houses, fixing them up and reselling them or holding houses as rentals. See N.T., 8/13/2015, at 14:1-23.

13. Dunetz and Toy first met at one of the DIG subgroup meetings held at Michael's Diner on Route 309 in Montgomeryville early on in 2010. See N.T., 8/13/2015, at 15:1-8; see also N.T., 10/22/2015, at 225:3-6.

14. Toy and Dunetz met a few subsequent times in Quakertown at John's Diner or the Quakertown Diner to discuss ways to "flip houses" to generate income including Dunetz investing money with Toy to purchase property, fix it up, put it back on the market, pay a realtor and then sell it. See N.T., 8/13/15, at 15-19.

15. Toy testified that he and Dunetz met at Michael's diner in February of 2010, on March 2, 2010, at the Quakertown Diner, on March 12, 2010, at John's Diner in Quakertown, on March 23, 2010, at Dave & Buster's, and at Toy's Office on March 31, 2010. See N.T., 10/22/2015, at 225:13-18.

16. Dunetz's understanding was that he and Toy would initially invest an equal amount of money, $250,000.00, the money would then be assigned to the purchase, fixing up and selling of "a particular house or apartment building or a package of houses." See N.T., 8/13/15, at 16:9-18:11.

17. Dunetz believed that he would be paid 4% interest annually on his investment and would receive 50% of the profits on the deals. See N.T., 8/13/15, at 17:6-15.

11

18. At his deposition, Dunetz testified that, "the meeting consisted of Mr. Toy presenting himself as an experienced real estate investor that had taken money from numerous other investors over a period of 20 years, and produced returns for them on their investments of 50 to 100 percent yearly and to infinity, when using other people's money." See Pls. Ex. 54, P.16.

19. Further, Dunetz testified at his deposition that Toy represented to him that there "was always four to five other investors with a total contribution of 650 to 750 thousand dollars." *Id.*, P.17.

20. Toy and Dunetz were to conduct a review of their association at the end of each of the first three years to consider whether they wanted to continue business endeavors together. See N.T., 8/13/15, at 17: 14-22.

21. During his business discussion meetings with Dunetz at various Quakertown diners, Toy discussed his companies, Kaheel Company and Jabrier Company and Toy's vast experience in real estate. See N.T., 8/13/15, at 19:10-22:7.

22. Toy testified that he discussed with Dunetz his experience, "flipping houses, ...buying holds...Tax sales, bankruptcy sales, landlording." See N.T., 10/22/2015, at 225:10-226:5.

23. Dunetz believed that Kaheel was the company where the funds were to be deposited. See N.T., 8/13/15, at 20:20-24.

24. Toy admitted that at the time he had the investment discussions with Dunetz, Kaheel owned no real estate and that he did not offer that information to Dunetz. See N.T., 10/22/2015, at 245:17-246:7.

12

25. Toy graduated from Babson College in 1985 with a degree in finance and investments. See N.T., 10/22/15, at 221:22-23.

26. Toy was involved in healthcare brokerage working for his Father from 1976 through 1999-2000. See N.T., 10/22/2016, at 222:4-6.

27. Toy and his Father were "brokers for wholesalers in the acute healthcare area, where we'd represent a paper company, a pharmaceutical company, and a janitorial supplies company, and we would wholesale those products to hospitals in Eastern Pennsylvania." See N.T., 10/22/2016, at 222: 8-12.

28. Toy first became involved in the business of real estate: buying, selling, and investing in 1986. See N.T., 10/22/2016, at 222:13-19.

29. He is a proclaimed self-taught real estate investor although he received his real estate license in 1988. See N.T., 10/22/2016, at 222:20-24.

THE INVESTMENT

30. When Dunetz tendered the $250,000.00 check to Kaheel, he believed that he would receive a receipt from Toy and an agreement explaining how his funds would be utilized, how they were going to be invested and all the terms of the arrangement the two had previously discussed. See N.T., 8/13/15, at 24:18-22.

31. During cross-examination, in response to the question about whether on April 1, 2010, there was a deal between Toy and Dunetz, Dunetz equivocated stating, "[w]e had a transferring of money. Until I had that agreement, I really didn't know what the deal was. So did we have a deal without an agreement? I'm not sure." See N.T., 8/13/15, at 44:14:17.

13

32. Toy asserted that the $250,000.00 investment was a 20 year loan with 4% annual interest only. See N.T., 8/13/15, at 22:16-20; 228:7-9.

33. Toy further asserted that apart from the 4% interest, as a return on Dunetz's investment, the two "would buy a property together, whether it was in Philly or the Lehigh Valley, and we would split the profits on any deals that made money." See N.T., 10/22/2015, at 229: 2-9.

34. Dunetz, credibly testified, that if those had been the terms he never would have invested the $250,000.00. See N.T., 8/13/15, at 22:16-25.

35. Dunetz's expectation was that he would receive returns on his investment of 10% to 15%. See N.T., 8/13/15, at 3-5.

36. At John's Diner in Quakertown, on April 1, 2010, Dunetz handed Toy check #1251, dated April 1, 2010, written from Triangle Home Invest, LLC to Kaheel Co, LLC for $250,000.00 and signed by Howard M. Dunetz. See N.T., 8/13/2015, at 23:16-24:22 and Exhibit P-1.

37. On the back the check was endorsed "for deposit only Kaheel Co., LLC" and appears to have a processing date of April 1, 2010.

38. On April 2, 2010, Toy faxed Dunetz an Acknowledgement of Receipt of Investment Funds, dated April 1, 2010, from "The Jack Toy Cos" at 11:38. See N.T., 8/13/15, at 24:18-19, Ex.P.3.

39. The Acknowledgment of Receipt of Investment Funds states:   .

This ACKNOWLEDGEMENT confirms and acknowledges the receipt by Kaheel Company, LLC of the total sum of Two Hundred Fifty Thousand Dollars ($250,000.00) received from Triangle Home Invest, LLC. Kaheel Company, LLC acknowledges that the Two Hundred Fifty Thousand Dollars ($250,000.00) received from Triangle Home Invest, LLC is to be utilized by Kaheel Company, LLC or its designee/assignee to purchase real property for investment purposes.

14

The terms and conditions of said investment are to be outlined in another agreement be[sic.] prepared in the near future. Kaheel Company, LLC agrees that it will provide a security interest to Triangle Homes Invest, LLC in the appropriate amount invested in any property(ies) which are purchased by Kaheel Company, LLC utilizing the funds received as acknowledged herein.

See Exhibit P-2; N.T., 8/13/2015, at 24:18-25:10.

40. The Acknowledgment was signed by Herbert J. Toy, III, Member on behalf of Kaheel Co., LLC. See *Id.*

41. Dunetz testified credibly that he had no discussions with Toy about Toy's use of personal draws from the $250,000.00 or Toy utilizing the $250,000.00 for vehicle expenses, gas, cars, or other personal expenses. See N.T., 8/13/2015, at 25:11-24.

42. Dunetz believed that the $250,000.00 was to be used solely as described in the Acknowledgement of Receipt of funds to purchase real properties. See N.T., 8/13/2015, at 26:13-16.

43. At his deposition, Dunetz testified that he had not placed any restrictions on Mr. Toy's use of the money except to "make me money." See Pls. Ex. 54, P.23-24.

44. At his deposition, Dunetz testified that he expected Mr. Toy's compensation to be the shared profits made from the real estate transactions. *Id.*

45. Although the Acknowledgment stated that the terms and conditions of the investment were to be memorialized in another agreement, Dunetz never received such an agreement. See N.T., 8/13/2015, at 26:17-21.

46. Although the Acknowledgement stated that Kaheel Company, LLC agreed to, "provide a security interest to Triangle Homes Invest, LLC in the appropriate amount invested in any property(ies) which are purchased by Kaheel Company, LLC utilizing the funds received as acknowledged herein," Triangle never

15

received any kind of mortgage from Kaheel even though Kaheel purchased several properties. See N.T., 8/13/2015, at 26: 22-27:4.

47. Dunetz stated that he did not receive a Note mentioning the investment being a 20 year loan until January 12, 2012. See N.T., 8/13/2015, at 27:15-28:12, Pls.' Ex. P4-P5.

48. At trial, Toy testified that it was his understanding "that the money that was provided by the Plaintiffs, the $250,000.00, was to be used solely to purchase, renovate and sell properties." See N.T., 10/22/2015, at 91:15-19.

THE BEGINNING OF THE DISPUTE

49. At his deposition, Dunetz testified that he had demanded a promissory note after December of 2011, when a purchase of an apartment building fell through. Toy failed to come up with funds, and Dunetz began investigating Toy's background. See Ex. P.54, Page 62.

50. Dunetz discovered that Toy had "$1,600,000.00 plus in judgments against him, he was not making any payments, I did not have an operating agreement, I was not secured by any properties, and that basically he was a thief." See Ex.P.54, page 77.

51. Toy testified that Dunetz began to voice objections to the way the business was handled at the end of June 2011, when Dunetz called Toy stating that he had lost $175,000.00 in a transactional funding scam and that he needed $135,000.00 returned from his original $250,000.00 investment. See N.T., 10/22/2015, 239:17-240:7.

16

52. Plaintiffs' Exhibit P-4, purports to be a Judgment Note, dated April 1, 2010, and signed by Herbert J. Toy, III, Member stating that, "On March 31, 2030, Kaheel Co., LLC of 739 N. New St. #1, Bethlehem, PA 18018 promises to pay to the order of Triangle Home Invest LLC of 1000 Gypsy Hill Road, Lower Gwyneed, PA 19002 the sum of Two Hundred Fifty Thousand Dollars ($250,000.00), plus interest and cost, without offset, for value received, together with interest at a rate of four percent (4%) per annum, until paid."

53. Duntez credibly testified that he was surprised to receive the note, and was struck by the 2030 date and thought that it was an error, and that the date was supposed to be March 30, 2013, as he had understood the arrangement to be a three-year term. See N.T., 8/13/2015, at 27:13-28:19.

54. Handwritten on the Fax Cover Sheet in Plaintiffs' Exhibit P5 is a note, that states, "Here's your note-[illegible two words]-Thx-JT."

55. Dunetz testified that his handwritten notations appear below Toy's and state, "Total Funds working with 750K. 50%, 50%, 6 other investors?, 1/2/3 year review/copy of check, received. Promised 100% returns." Dunetz further testified that he called Toy after receiving the fax to discuss the items he noted on the fax coversheet. See Pls. Ex. 5; N.T., 8/13/2015, at 29:2-31:3.

56. Dunetz credibly testified that Toy, had originally informed Dunetz that he had a number of other investors in Kaheel that functioned as silent partners in his business. The investors gave Toy cash, and in return received 4% returns on their investment and 50% of the profits from their investment. See N.T., 8/13/2015, at 31:4-8.

17

57. Dunetz further credibly testified that Toy had told him that he regularly produced returns of 50 to 100% annually on the money invested with him." See N.T., 8/13/2015, at 31:10-13.

58. Toy denied making any representations about returns of 50 to 100% to infinity on Dunetz's money to Dunetz as the promise would have been "unrealistic." See N.T., 10/22/2015, at 228:15-229:1.

59. Plaintiffs' Exhibit P-6 is a copy of the judgment note received by Dunetz with additional handwritten notations made by Dunetz.

60. Dunetz circled the 2030 date believing it to be incorrect, and he made a notation to add "and or assigns" to Kaheel Co., LLC. See Ex. P6.

61. Dunetz noted dates for payments quarterly, June 30, Sept. 29, Dec. 31, March 31, and noted disbursements how calculated, when? *Id.*

62. Further handwritten notes state: "personal guarantee. Draw down original investment provision....Renews annually upon mutual agreement....Dissolution return of funds." *Id.*

63. Dunetz explained that when he called Toy to discuss these items and to seek a "real" note with what we discussed in the very near future, Toy "had a problem with the personal guarantee. He said his attorney's not going to like that. He told me his attorney's not going to like that. He told me any money that I borrowed from anybody meaning personal individuals, I gave a personal guarantee too." See N.T., 8/13/15, at 29:25-30:3.

18

64. As for quarterly payments, Duntez wanted in detail in the agreement the actual dates when the $2,500.00 payments would be made. See N.T., 8/13/2015, at 32:15-19.

65. Further, Dunetz wanted to know whether the profits would be dispersed at the time of the sale of the property or at the end of the year when you receive the tax filing. See N.T., 8/13/2015, at 33:7-17.

66. Dunetz expected a personal guarantee that Toy would be responsible for seeing that Dunetz received his money back and whatever profits were due to him. See N.T., 8/13/2015, at 35:12-13.

67. As for the drawdown of original investment provision, Dunetz was seeking a refund of $135,000.00 of his initial investment as his finances were tight at the time due to losing money in a 2011 transactional funding venture. See N.T., 8/13/2015, at 35:14-17.

68. Dunetz did not receive the $135,000.00, and shortly after receiving the judgment note on January 12, 2012, he went to the Northampton Courthouse in Easton to pull all the records on Herbert Toy and all his various entities. See N.T., 37:10-17.

69. After receiving the January 10, 2012 fax from Toy, Dunetz received no further quarterly interest payments. See N.T., 8/13/2015, at 34:14-24.

70. Dunetz stated that sometime in late January or early February of 2012, Toy stopped communicating with Dunetz. See N.T., 8/13/2015, at 39:18-20.

19

## THE JEFFERSON HOUSE PROPERTY DEAL

71. Prior to the breakdown in communication between the parties, Dunetz had acted on behalf of Kaheel and Jabrier and had in fact signed many real estate purchase agreements for them, believing that he was a member of the LLC. See N.T., See also Ex. P54, Page 68.

72. A friend of Dunetz, Marco Derro, had asked Dunetz if he and Toy would be interested in being partners with Mr. Derro in the purchase of the Jefferson House Property, located at 449-455 North 50th Street in Philadelphia, which was a 24-unit apartment building. See N.T., 8/13/15, at 56:19.

73. Toy alleged that Dunetz breached their agreement by participating in the assignment of the Agreement for the Sale of Commercial Real Estate for the Jefferson House Property to another buyer for $45,000.00 in cash and retaining $28,000.00 of that cash for himself under the belief that he was a member of Jabrier and had earned the assignment fee, and giving the rest of the cash to Mr. Derro. See N.T., 8/13/2015, at 59:17-71:17; Ex. D9.

74. In a rather bizarre description of a business transaction, Dunetz testified that at the behest of Toy and Mr. Derro, he went to a restaurant in Media, Pennsylvania:

> A. I was to show up there and someone was to give me something, a bag, or – it was a bag. It was a plastic, red bag.
> Q. Who was supposed to give you something?
> A. I don't know.
> Q. So you're going to a restaurant in Media to pick up something from someone that you don't know?
> A. Correct.
> Q. and had never seen before?
> A. The person gave me the bag, I don't think I had ever seen them before, but I'm going to surmise that there was someone present that knew what I looked like. [...]

20

A. I mean, this was following a closing, an exchange of ownership of this property, just to put it in context. [...]

A. I stepped into the restaurant. Somebody walked up to me, pushed a bag in my chest, and they said, leave. And I turned around and walked out.

Q. Okay. So the person didn't identify—was it a man?

A. All they said was, leave. It was a man. I can't remember what they looked like. I didn't know the person.

Q. Without asking you to identify yourself, the person hands you a bag containing $45,000.00 of cash? That's what you're telling us?

A. Yes, yes.

Q. And you left?

A. Yes.

Q. Never asking—I mean, you could see that it was a wad of cash?

A. Oh, I was going there to pick up this bag, or whatever container it was going to be in, of cash. I mean, I knew exactly why I was going there. Either Jack or Marco asked me to go there. I believe it was Jack, but I know I spoke to him a few minutes. Afterwards, but I'm not sure who told me where to be when. [...]

Q. You testified, I think, that Mr. Toy was expecting to receive some portion of the cash you picked up correct?

A. Correct.

Q. Did you give any of that cash to him?

A. No.

Q. To whom did you give the cash?

A. I gave --well—

THE COURT: If anybody.

THE WITNESS: No. It was distributed, Marco Derro got a bigger chunk of it since he was the one who found the property and got it to the point where it was assigned to somebody else. And the rest of the money, I still have it in the red bag.

BY MR.DESCHLER:

Q. How much do you have?

A. I think it may be $28,000.00, I think.

Q. Did you say you still have it in the red bag?

A. I do.

Q. $28,000.00 in cash?

A. Yes.

[...]

THE COURT: The focus of the question was why you felt—why do you feel you were entitled to the--?

A. I was operating under the assumption that I was a member of this Jabrier LLC.

See N.T., 8/13/15, at 61:15-69:16

75. Dunetz testified that Toy was supposed to produce the $169,990.00 due at the signing of the settlement for the Jefferson House Property. The agreement stated that it was being sold to Jabrier Co, LLC and/or assigns, and Marco Derro. See N.T., 8/13/15, at 74:3-8; Ex. D9.

76. The Agreement for the Sale of the Jefferson House Property was initialed by M.D., and H.J.T., and was signed by Marco Derro on 10/12/2011 and by Jabrier Co, LLC signed by Herbert Jack Toy on 10/13/2011. See Ex.D9.

77. Five Addendums were attached to the Agreement for the Sale of the Jefferson House Property extending the settlement date to on or before December 22, 2011. *Id.*

78. Addendum 1 to the Agreement for Sale of the Jefferson House Property, permitted the contract to be assigned to an unnamed entity. *Id.*

79. The parties kept extending the date for settlement as Toy was unable to produce the funds to close on the property. See N.T., 8/13/2015, at 74:9-76:20; See also N.T., 10/22/2015, at 247:23-250:9.

80. Dunetz testified that it was his understanding that the agreement ultimately expired. See N.T., 8/13/15, at 76:21-23.

81. Defendant introduced as Defendant's Exhibit 10, a screenshot purporting to be an exchange of text messages between Toy and Dunetz dated December 22, 2011, where Dunetz texted Toy, "Picked up package!"

82. Toy testified that Jabrier is owed the money Dunetz has retained on the basis that Jabrier had not terminated or released its interest under the agreement of sale that permitted settlement up to December 22, 2011, and "[b]y coincidence on that same day, the

22

property was sold to SJS Holdings through Horizon Abstract in Media on the same day."
See N.T., 10/22/2015, at 234:3-23.

THE DEFENDANT BUSINESS ENTITIES:

83. Toy uses 739 North New Street, Unit 1, Bethlehem, PA 18020, as a business address and offices for Kaheel, Jabrier, Terrey, and The Jack Toy Cos. See N.T., 10/22/2015, at 83:22-23; 87:24-88:4.

84. Toy owns the property of 739 North New Street with his father Herbert J. Toy, Jr. See N.T., 10/22/2015, at 83:24-84:12.

Kaheel:

85. Toy alleges that for the entire time that Kaheel has existed that he has remained the sole member of the company. See N.T., 10/22/2015, at 85:1-85:9.

86. Plaintiff's Exhibit 43 contains the operating agreement of Kaheel. See N.T., 10/22/2015, at 84:5-9.

87. The Kaheel operating agreement paragraph 5 provides that, "Compensation of Member: The member may be reimbursed for all expenses incurred in managing the Company and may, at the election of the Member, be entitled to compensation for the management services rendered, in the amount to be determined from time to time by the Member." See Pls.' Ex. 34.

88. In paragraph 6, the Kaheel operating agreement provides, "Distributions: Distribution shall be made to the Member (in cash or in kind) at the times and in the aggregate amounts determined by the Member and as permitted by the applicable law." Id.

89. Paragraph 9 of the Kaheel operating agreement governs the admission of additional members stating, "Additional members of the Company may be admitted to the Company

23

at the direction of the Member only if a new operating agreement or an amendment and restatement of this Agreement is executed." *Id.*

90. Furthermore, paragraph 10 of the Kaheel operating agreement limits the liability of the Member stating, "The Member shall not have any liability for the debts, obligations or liabilities of the Company or for the acts or omissions of any other member, officer, agent, or employee of the Company except to the extent provided in the Act. The failure of the Member to observe any formalities or requirements relating to the exercise of the powers of the Member or the management of the business and affairs of the Company under the Agreement or the Act shall not be grounds for imposing liability on the Member for liabilities of the company." *Id.*

91. Additionally, the Kaheel operating agreement provides for the company to indemnify the Member under the agreement for "all costs, losses, liabilities and damages paid or accrued by the Member (as the Member or as an officer, agent, or employee) or any such officer, agent, or employee in connection with the business of the Company, except to the extent prohibited by the laws of the Commonwealth of Pennsylvania." *Id.*

92. Also of note, Paragraph 13 of the Kaheel operating agreement regards conflicts of interest between Kaheel and the Member it states, "[n]othing in this Agreement shall be construed to limit the right of the Member to enter into any transaction that might be considered to be competitive with, or a business opportunity that may be beneficial to, the Company. The Member does not violate a duty or obligation to the Company merely because the conduct of the Member furthers the interests of the Member. The Member may lend money to and transact other business with the Company. The rights and obligations of the Member upon lending money to or transacting business with the

Company are the same as those of a person who is not the member, subject to other applicable law. No Transaction with the Company shall be void or voidable solely because the Member has a direct or indirect interest in the transaction." *Id.*

93. Furthermore, the Kaheel operating agreement purports to protect the operating agreement from being used by a creditor, such as Dunetz, with paragraph 17 that states, "Rights of Creditors and Third Parties. This Agreement is entered into by the Member solely to govern the operation of the Company. This Agreement is expressly not intended for the benefit of any creditor of the Company...Except and only to the extent provided by applicable statute, no creditor or third party shall have any rights under this Agreement or any agreement between the Company and the Member, with respect to the subject matter hereof." *Id.*

94. Plaintiffs' Exhibit 44 was a copy of the record from the Pennsylvania Department of State dated July 19, 2007 documenting the creation of Kaheel. See N.T., 10/22/2015, at 85:10-19 and Pls.' Ex. 44.

95. Toy testified that "Kaheel paid all the bills" regardless of whether the properties were owned by Jabrier. See N.T., 10/22/2015, at 121:5-6; 127:19-128:6.

Jabrier:

96. Plaintiffs' Exhibit 45 was the operating agreement for Jabrier which lists in Annex A, Herbert J. Toy, III as the sole Member owning 1000 units or a 100% share in the company dated 12/1/2004. See N.T., 10/22/2015, at 85:20-86:12; Pls. Ex. 45.

97. Jabrier's operating agreement states, "this Agreement, as it may be amended from time to time, shall be binding on any person who at the time is a Member, regardless of whether

25

or not the person has executed this Agreement or any amendment hereto." See Pls. Ex. 45.

98. Under Section 3.01, Jabrier defined initial and subsequent members as follows: "[t]he Members of the Company are the Persons listed in Annex A. A person who is not already a member and who acquires a previously outstanding Unit or Units in accordance with this Agreement shall automatically be admitted as a Member; other Persons may be admitted from time to time upon the issuance to them of a Unit or Units on such terms as are fixed by the Board of Managers. It shall not be necessary for Persons who are subsequently admitted as Members or who acquire any or all of an existing Member's Units to execute this Agreement either by counterpart or amendment. When any Person is admitted as a Member or ceases to be a Member, the Board of Manager's shall prepare a revised version of Annex A and distribute it to all the Members." *Id.*

99. Section 3.04 of Jabrier's Operating Agreement governs the transferability and assignment of units, permitting the transfer of Units and Membership Interests in whole or in part without obtaining the approval of any of the Members. See *Id.*

100. Toy testified that in accordance with Section 4.01 Capital Contributions of Jabrier's Operating Agreement; he initially contributed $1000.00 for 1000 units paying the price of $1.00 per share. See N.T., 10/22/2016; at 86:5-87:2; Pls. Ex. 45.

101. Under the Jabrier Operating Agreement, there was only to be one manager of the company elected annually by the Members. See Pls. Ex. 45, Article 5.

102. Under §5.07 of the Jabrier Operating Agreement, managers were to be compensated, "if any for their services as Managers as may be designated from time to time by the Board

26

of Managers. In addition, Managers shall be entitled to be reimbursed for out-of-pocket expenses incurred in the course of their service as Managers." See Pls. Ex. 45.

103. The Jabrier Operating Agreement also contains a Conflict of Interest Policy, at §5.08 that states, "Other Business Opportunities. Subject to the other express provisions of this Agreement, each Manager of the Company at any time and from time to time may engage in and possess interests in other business ventures of any type and every type and description, independently or with others, **except ones in competition with the Company**, with no obligation to offer to the Company or any Member or Manager the right to participate therein." *Id.* (Emphasis Added).

104. The Jabrier Operating Agreement provides for limited liability for the Manager, "unless the person's conduct constitutes self-dealing, willful misconduct, or recklessness." *Id.* at §5.10.

105. Section 10.05 of the Jabrier Operating Agreement covers amendments to said agreement, the provision states that, "[t]his agreement or the Certificate may be amended from time to time only by vote of both (i) the Managers serving at the time at any regular or special meeting of the Board of Managers, and (ii) the Members at an annual or special meeting of the Members. All amendments must be in writing and shall take effect when given to the Members pursuant to section 10.02. An Amendment to Annex A shall not be considered an amendment requiring a vote." *Id.*

106. Plaintiff's Exhibit 46 is a Certificate of Organization of a Domestic Limited Liability Company from the Pennsylvania Department of State reflecting that Jabrier was organized on December 1, 2004.

27

107. Toy testified that at no time has he transferred any units of membership interest in Jabrier to any other party. See N.T., 10/22/2015, at 86:5-12.

Terrey:

108. Toy formed Terrey Property Management as a corporation. See N.T., 10/22/2015, at 87:16-20.

109. Toy is the sole shareholder of Terrey. See N.T., 10/22/2015, at 87:21-23.

110. Toy testified that he has never transferred any ownership interest in Terrey to any other person. See N.T., 10/22/2015, at 88:5-8.

111. Terrey's certificate of organization was dated November 14, 2005.

THE MONEY/PROPERTY TRAIL

112. Toy alleges that his use of Dunetz's $250,000.00 investment was legitimate. His Answer to Plaintiff's Complaint, stated, "Toy, solely as a member of Kaheel, secured financing on a long-term basis from Triangle as hereinafter detailed in Defendants' New Matter. Kaheel utilized the financing to subsequently lend money to Jabrier to purchase, renovate and sell properties." See N.T., 10/22/2015, at 90:10-24; Defs.' Ans. to Pls. 3rd Amend. Compl., ¶15.

113. Toy claimed that the reason he formed several separate business entities was based on advice from legal counsel "that the best way to do that [keep everything separated] was to have one entity own the properties, have another entity finance the properties so if there's a problem with one of the entities, the other one could be cleared." See N.T., 10/22/2015, at 223:7-18.

114. Toy testified that Kaheel was to be the financing entity and Jabrier was to be the property owning entity. See N.T., 10/22/2015, at 223:19-23.

28

115. Toy testified that Jabrier has had assets throughout the course of its existence in the form of real estate and that Kaheel has had assets in the form of mortgages on Jabrier properties. See N.T., 10/22/2015, at 223:14-22.

116. By the end of 2008, neither Kaheel, Jabrier, nor Terrey owned any property and Mr. Toy was unemployed.

**2010**

117. In March of 2010, prior to Triangle's investment, the balance in Kaheel's bank account was $0.00. See Ex. P35.

118. After the $250,000.00 check from Triangle was deposited and cleared on April 7, 2010, that same day Toy took a $10,000.00 personal draw to himself. See Ex. P38; see also N.T., 10/22/2015, at 96:12-97:19.

119. On April 20, 2010, Kaheel received a $50,000.00 investment from Duggan Real Estate Investment, LLC. See Ex. P35, see also N.T., 10/22/2015, at 95:10-12.

120. On April 28, 2010, Toy took a $2,000.00 personal draw to himself making his total monthly personal draw to himself $12,000.00 for April of 2010. See Ex. P35-P38.

121. Additionally, from April 2010 to the filing of this suit, Toy paid the cable bill for the office used by Kaheel, Jabrier, Terrey, and the Jack Toy Co's, postage expenses, a company car, a computer, storage, gas, car expenses, car insurance, restaurant bills, hotel bills, airfare, and golf trips from the Kaheel business account. See N.T., 10/22/2015, at 96:1-161:25.

122. In May of 2010, Toy took a total of $8,000.00 in personal draws to himself from the Kaheel bank account. See Ex. P38.

123. In May of 2010, Kaheel paid a total of $22,000.00 to settle the property of 3128 Hartville St., Philadelphia, PA which was titled in the name of Jabrier. A mortgage was recorded from Jabrier to Kaheel for $75,000.00 for the 3128 Hartville St. property. See Ex. P38; Ex. P23-P29.

124. Exhibit P27 is a letter signed by Herbert J. Toy, authorizing Howard Dunetz to sign on behalf of Jabrier Co., LLC the documentation necessary for the settlement of the 3128 Philadelphia property.

125. Thus at the end of May 2010, Toy had spent $20,000.00 of the combined $300,000.00 investment funds on personal draws to himself and $22,000.00 of the investment funds on a real estate property.

126. In June of 2010, Toy withdrew a total of $15, 981.70 in personal draws to himself from the Kaheel Bank Account. See Ex.P38.

127. On June 30, 2010, Toy made a $2,500.00 quarterly interest payment to Triangle via check 103 from Kaheel's bank account. See Ex. P.38.

128. In July of 2010, Toy paid Duggan Real Estate Investment, LLC a $600.00 quarterly interest payment from Kaheel's bank account. See Ex. P35-P38.

129. In July of 2010, Toy paid contractors $6,105.79 for work done on the 3128 Hartville St. Property from the Kaheel Bank Account. See Ex.P38.

130. In July of 2010, Toy withdrew a total of $15,700.00 in personal draws to himself from the Kaheel Bank Account. See Ex. P35-38.

131. Additionally, in July 2010, Toy made a $2000.00 down payment on the 624 W. Chew St. property and paid $300.00 for the inspection of 926 W. Chew St., Allentown, PA from the Kaheel bank account. See Ex. P35-P38.

132. In August of 2010, Toy made total withdrawal of $8,000.00 in personal draws to himself from the Kaheel bank account. See Ex. P35-P38.

133. In August of 2010, Toy paid $597.02 of expenses related to or for work done at the 3128 Hartville St. Property from the Kaheel bank account. See Exhibits P35-P38.

134. In August of 2010, Toy paid $350.00 for the inspection of 885 Andover Property from the Kaheel bank account. See Ex. P35-P38.

135. In August of 2010, Toy paid $300.00 for the inspection of the 624 W. Chew St. Property from the Kaheel bank account. See *Id.*

136. In addition, in August of 2010, Toy paid $34,359.87 from the Kaheel bank account to purchase 926 W. Chew St. Allentown, PA and $141.00 to State Farm Insurance for the 926 W. Chew St. Property. See *Id.*

137. The 926 W. Chew St. Property was titled to Jabrier Company and a Mortgage was given from Jabrier to Kaheel for $90,000.00 with monthly payments to be made from Jabrier to Kaheel and the full debt if not paid earlier, due and payable on August 1, 2040. See Ex. P11 (Deed for 926 W. Chew St. Allentown, PA price listed as $33,250.00); P12 (Settlement Statement signed by Toy as Member of Jabrier; P13 (Mortgage).

138. The Mortgage for the 926 W. Chew St. Property was recorded on September 13, 2010 with the Lehigh County Clerk of Judicial Records. See *Id.*

139. In September of 2010, Toy made a total of $10,000.00 in personal draws to himself from the Kaheel bank account. See Ex. P35-P38.

140. In September of 2010, Toy made a $3000.00 down payment for the 434 N. Fulton St. Property and paid $300.00 for the inspection of said property from the Kaheel bank account. *Id.*

141. Also in September of 2010, Toy made a $3000.00 down payment for a 915 W. Cedar Property and paid $300.00 for the inspection of the 915 W. Cedar Property from the Kaheel bank account. *Id.*

142. Also in September of 2010, Toy made a $900.00 interest payment to Duggan Real Estate Investment, LLC and a $2,500.00 interest payment to Triangle. *Id.*

143. In October of 2010, Toy withdrew a total of $8,500.00 in personal draws to himself from the Kaheel bank account. See Ex. P35-P38.

144. In October of 2010, Toy paid $115.00 for an inspection of the 434 N. Fulton St. Property and paid $39,519.45 for Jabrier to purchase the 434 N. Fulton St. property from the Kaheel bank account. See Ex. P35-P38; P7-P10.

145. Additionally, in October of 2010, Toy spent $325.00 on hauling expenses for the 434 N. Fulton St. property. See Ex. P35-38.

146. The 434 N. Fulton Street, Allentown, PA property was titled in the name of Jabrier Company for the purchase price of $40,000.00. See Ex.P7.

147. The Settlement Statement for the 434 N. Fulton Street Property representing that Jabrier was paying $39,519.45 for the property was signed by Herbert J. Toy, III as President of Jabrier. See Ex.P8.

148. An unsigned Note dated October 18, 2010, from Toy and the Jabrier Company to Duggan Real Estate Investment, LLC regarding the 434 North Fulton St. Property was made in the amount of $40,000.00 as principal for a loan with 12% annual interest. The loan was to be repaid by April 18, 2012. Monthly interest payments were to begin November 18, 2010 in the amount of $400.00 per month. See Ex P9.

149. Also on October 18, 2010, a mortgage was created between Jabrier and Kaheel Company in the amount of $80,000.00 for the purchase of 434 North Fulton Street, Allentown, PA property.  There were to be monthly payments with full repayment due on April 18, 2012.  See Ex.P10.

150. This Mortgage was recorded on October 29, 2010, at the Lehigh County Clerk of Judicial Records.  See Ex. P11.

151. Additionally, in October of 2010, Toy purchased a 1998 beige Buick automobile for $2874.50 with funds from the Kaheel bank account.  See Ex.P.35-P38.

152. In November of 2010, Toy withdrew a total of $4,750.00 in personal draws from the Kaheel bank account and used $106.54 for expenses from the Kaheel bank account.  See Ex. P35-P38.

153. The Northampton County Reporter Vol. LVI No.47 for November 25, 2010, lists that by virtue of a certain writ of execution CV-2009-03584, the premises known as 1032 Monocacy Street, Bethlehem, Northampton County, PA and titled to Herbert J. Toy, III and Maureen Toy, h/w was seized and taken into execution of the writ as the property of Herbert J. Toy, III and Maureen Toy.  See Ex.P.34.

154. In November of 2010, Toy paid $1700.00 from the Kaheel bank account for roofing work done on the 3128 Hartville St. Property.  See Ex. P35-P38.

155. In November of 2010, Toy paid $ 2500.00 to contractors for work on the 434 N. Fulton St. property from the Kaheel bank account.  See Ex. P35-P38.

156. Additionally in November of 2010, Toy paid $3745.61 for work and supplies for the 926 W. Chew St. Property from the Kaheel bank account.  *Id.*

157. In November of 2010, Toy paid $350.00 for an inspection of a 5230 Heston St. property from the Kaheel bank account. *Id.*

158. Additionally in November of 2010, Toy purchased 5230 Heston St. property for Jabrier for $27,000.00 with money from the Kaheel bank account. *Id.*

159. In November of 2010, Toy spent $5,202.00 on work done on the 5230 Heston St., property from the Kaheel bank account. *Id.*

160. The deed between Cynthia Moore and Jabrier Co., LLC for the 5230 Heston St. property states that the property was purchased for $25,000.00 and the attached Philadelphia Real Estate Transfer Tax Certification lists the fair market value for the property to be $12,720.32. See Ex. P.16.

161. On November 8, 2010, Toy sent an email confirming that Jabrier Co.,LLC gave Dunetz authority to sign on behalf of Jabrier Co., LLC, regarding the settlement of 5230 Heston St., Philadelphia, PA 19131. See Ex.P18.

162. Based upon the settlement sheet for the 5230 Heston St. property the total amount paid for the property was $27,026.86. See Ex. P19.

163. A Mortgage was made between Kaheel and Jabrier and signed by Herbert J. Toy, as Member of Jabrier on November 8, 2010 regarding the 5230 Heston St. Property in the amount of $75,000.00. See Ex.P.17.

164. Also on November 8, 2010, an Interest Only Balloon Note was made between Jabrier and Kaheel regarding the 5230 Heston St. Philadelphia, PA Property, the loan was in the amount of $75,000.00, the yearly interest was to be at the rate of 4.00% and Jabrier was to begin making monthly payments to Kaheel of $250.00 on December 8, 2010. The

Interest Only Balloon Note was signed by Herbert J. Toy, III, Member of Jabrier Co. See Ex.P.20.

165. However, under Section 6 (a) Late Charges for Overdue Payments of the Interest Only Balloon Note, the late charge was marked n/a. See *Id.*

166. In December of 2010, Toy paid $1,633.57 for work done on the 926 W. Chew St. Property from the Kaheel bank account. See Ex. P35-38.

167. In December of 2010, Toy withdrew a total of $5,300.00 in personal draws from the Kaheel bank account, not including expenses such as gas, car insurance, wine and beer that he paid for with the Kaheel bank account. See *Id.*

168. In December of 2010, Toy made an interest payment to Duggan Real Estate Investment, LLC of $900.00 and an interest payment to Dunetz of $2500.00 from the Kaheel bank account.

169. Thus for the first nine months of the investments by Duggan Real Estate and Dunetz, Toy spent a total of $88,231.70 of the $300,000.00 investment on himself as personal draws, or as his personal salary. This is roughly 29.41% of the investment funds or close to one third of the entire investment that was dissipated via cash payments to Toy. This does not include the expenses for all three companies that Toy was paying from the Kaheel bank account, or the car, car insurance, gas, or Christmas presents for contractors that Toy also used the Kaheel bank account to pay.

170. In the first nine months of the investments by Duggan Real Estate and Dunetz, Toy spent a total of $154,844.31 on investigating, purchasing, and renovating real estate properties. This is roughly 51.6% of the investment funds.

171. Dunetz and Duggan had received quarterly interest payments each quarter that they were entitled to receive them in 2010.

172. With the interest payments, real estate investment purchases and costs, and Toy's personal draws, he had spent roughly $250,000.00 of the initial $300,000.00 investment by the close of 2010.

173. Kaheel's Tax Return for 2010 states that all investments are at risk and reports a loss of $34,373.00. Included in the business expenses are car and truck expenses of $10,725.00, Depreciation of $865.00, Insurance of $514.00, Legal and Professional Services of $2,759.00, office expense of $746.00, repairs and maintenance of $1,041.00, travel of $458.00, deductible meals and entertainment $607.00, utilities of $8,291.00, other expenses of $8,367.00, and no wages. See Ex. P47

174. Jabrier's Tax Return for 2010 states that all investments are at risk and lists a tentative loss of $64.00; lists purchased items of $181,944.00 and under other expenses he lists bank service charges of $250.00, Dues and subscriptions of $87.00, Gifts of $1,260.00, Inspections of $950.00, Miscellaneous expenses of $800.00, Storage expense of $20.00, and a forfeited deposit of $5000.00. See Ex. P.47.

2011

175. In January of 2011, Toy paid $294.64 for an inspection of 926 W. Chew St. and 434 N. Fulton St. Property from the Kaheel bank account. See Ex. P. 36-P38.

176. Additionally, in January of 2011, Toy paid $ 1513.23 for work and electricity for the 926 W. Chew St. property from the Kaheel bank account. See Id.

177. In January of 2011, Toy paid $88.89 in utilities for the 5230 Heston St. Property from the Kaheel Bank account. See Id.

178. In January of 2011, Toy withdrew $7,500.00 in total personal draws from the Kaheel bank account. See *Id.*

179. Also in January of 2011, Toy paid $130.90 for a room at the Double Tree Hotel on a trip with Dunetz to see property in Delaware. See *Id.*

180. In February of 2011, Toy withdrew a total of $5,800.00 in personal draws from the Kaheel bank account and withdrew $500.00 for accounting from the Kaheel bank account. See *Id.*

181. In February of 2011, Toy paid a total of $11,285.58 for work, supplies, plumbing, and utilities for the 926 W. Chew St. Property from the Kaheel bank account. See *Id.*

182. In February of 2011, Toy paid $48.48 in utility costs for the 434 N. Fulton St. Property from the Kaheel bank account. See *Id.*

183. In February of 2011, Toy paid $133.77 for gas for the 5230 Heston St. Property from the Kaheel bank account. See *Id.*

184. In March of 2011, Toy withdrew a total of $4000.00 in personal draws from the Kaheel bank account and also paid for numerous lunches and gas, a computer for the office from Best Buy in the amount of $635.98, and paid for a Florida Trip to see property in the amount of $413.37 from the Kaheel bank account. See *Id.*

185. In March of 2011, Toy made an interest payment of $2,500.00 to Triangle and $900.00 to Duggan Real Estate Investment, LLC from the Kaheel bank account. See *Id.*

186. In March of 2011, Toy paid $775.00 to a contractor for work done at the 434 N. Fulton St. Property from the Kaheel bank account. See *Id.*

187. In March of 2011, Toy paid $7,381.87 for hauling and work done on the 926 W. Chew St. property from the Kaheel bank account. See *Id.*

37

188. In March of 2011, Toy paid a miscellaneous contractor $278.76 and made a home depot purchase of $32.80 not associated with a particular property from Kaheel's bank account. See *Id.*

189. In April of 2011, Toy withdrew a total of $3000.00 in personal draws from the Kaheel bank account. See *Id.*

190. Additionally in April of 2011, Toy claims that he has taken as a personal draw $16,457.65 from Kaheel's bank account which he used to purchase 1400 Gandy Blvd N.#716, St. Petersburg, FL as there is no resulting mortgage to Kaheel Company made and the property is deeded to Terrey instead of Jabrier. In Kaheel's bank ledger he lists these withdrawals not as personal draws ("HJT") but rather as "purchase #716." See Ex. P35-P38; P31; See N.T., 10/22/2015, at 137:1-140:14.

191. The Court finds this to be a conversion of Kaheel's funds designed to shield the profits from the Florida property from any of Kaheel's creditors. See Ex. P31.

192. In April of 2011, Toy paid $790.60 from Kaheel's bank account for his trip to Florida, expenses in Florida, and his gas in Florida related to the 1400 Gandy Blvd. Property purchase. See Ex. P38.

193. In April of 2011, Duggan Real Estate Investment, LLC invested another $30,000.00 into Kaheel. See Ex. P35-P38.

194. In April of 2011, Dave Leidel, a friend of Toy, invested $25,000.00 in Kaheel according to Toy without any terms of the investment, just that "we were going to buy property together and its sitting out there right now" and "he gave me $25,000.00—he gave Kaheel $25,000.00 to put in real estate." See N.T., 10/22/2015, at 135:7-136:16.

38

195. In April of 2011, Toy paid a total of $5138.00 for work done on the 434 N. Fulton St. Property from the Kaheel bank account. See Ex. P35-P38.

196. In April of 2011, Toy paid a total of $1296.50 for work done and utilities for the 926 W. Chew St. Property from the Kaheel bank account. See *Id.*

197. In April of 2011, Toy paid a total of $374.98 for utilities for the 5230 Heston St. Property from the Kaheel bank account. See *Id.*

198. In May of 2011, Toy withdrew a total of $4000.00 in personal draws to himself from the Kaheel bank account. Additionally, he withdrew $379.15 for his miscellaneous expenses, including golfing, from the Kaheel bank account. See *Id.*

199. In May of 2011, Toy paid a total of $18,010.55 in work and other various expenses for the 434 N. Fulton St. property from the Kaheel bank account. See *Id.*

200. In May of 2011, Toy paid $564.16 for utilities and insurance for the 926 W. Chew St. Property from the Kaheel bank account. See *Id.*

201. In May of 2011, Toy paid $2971.12 for work done on and utilities for the 5230 Heston St. Property from the Kaheel bank account. See *Id.*

202. In June of 2011, Toy withdrew a total of $8050.00 in personal draws to himself from the Kaheel bank account. See *Id.*

203. In June of 2011, Toy made a $900.00 interest payment to Duggan Real Estate Investment, LLC from the Kaheel bank account. See *Id.*

204. In June of 2011, Toy paid a total of $7676.52 for work done on and utilities for the 5230 Heston St. Property from the Kaheel bank account. See *Id.*

205. In June of 2011, Toy paid a total of $6400.37 for work done on and utilities for the 434 N. Fulton St. Property from the Kaheel bank account. See *Id.*

206. In June of 2011, Toy also paid $200.00 to Jabrier Co, LLC, and made an additional $360.00 payment to Duggan Real Estate Investment, LLC from the Kaheel bank account. See *Id.*

207. In July of 2011, Toy withdrew a total of $9,400.00 in personal draws to himself from the Kaheel bank account. He additionally withdrew money from the Kaheel bank account for gas, lunches, dinners, golf, storage, office supplies, and wine. An additional $1600.00 with the notation, "HJT3-600-Jabrier 1k" was withdrawn from the Kaheel bank account. See *Id.*

208. In July of 2011, Toy paid $21.34 for an expense at the 434 N. Fulton St. property from the Kaheel bank account. See *Id.*

209. In July of 2011, Toy paid a water bill in the amount of $32.91 for the 926 W. Chew St. property. See *Id.*

210. In July of 2011, Toy made his first sale of one of the purchased properties selling 5230 Heston Street to Beverly Artis on July 29, 2011. See Ex. P21.

211. By July of 2011, Kaheel had expended roughly $43,797.26 in the purchase, renovation and resale of the 5230 Heston Street Property.

212. Kaheel held a $75,000.00 mortgage on the 5230 Heston Street Property.

213. The HUD Settlement Statement for the sale of 5230 Heston Street Property reveals that the amount paid by Beverly Artis for the property was $80,153.11 with $153.11 going to the City of Allentown to pay taxes on the property for August 2, 2011 through December 30, 2011 in the amount of $153.11, the seller was charged $8052.85 in settlement charges and the seller paid the closing costs of $3,100.00 leaving the remaining amount paid of $69,000.26. See Ex.P22.

214. The $69,000.26 was listed as "payoff First Mortgage to Kaheel Co, LLC." See *Id.*

215. The $69,000.26 was deposited in Kaheel's bank account in August of 2011. See Ex. P36-P38.

216. Kaheel made an approximate profit of $25,000.00 on the sale of the property.

217. However, due to the inflated paper mortgage of $75,000.00 it appears on paper that Kaheel and Jabrier had suffered a loss from the sale of the property.

218. None of the profits from the sale of the 5230 Heston St. Property were distributed to Dunetz. However, at the time of the deposit of the $69,000.26, on August 2, 2011, Toy withdrew a $10,000.00 personal draw. See N.T., 10/22/2015, at 188:6-19.

219. In addition to the $10,000.00 personal draw to Toy on August 2, 2011, Toy withdrew a total of $6,492.35 in personal draws to himself from the Kaheel bank account along with another $310.13 in miscellaneous expenses. See Ex. P.36-P38.

220. In August of 2011, Kaheel paid Jabrier a total of $450.00 from the Kaheel bank account. See Ex. P36-P38.

221. In August of 2011, Toy paid $7,668.48 for work and landscaping done on the 434 N. Fulton St. property. See *Id.*

222. In August of 2011, Toy paid a $900.00 interest payment to Duggan Real Estate Investment and an additional $540.00 from the Kaheel bank account. See *Id.*

223. In August of 2011, Toy paid an outstanding gas bill for the 5230 Heston St Property of $77.77.

224. In August of 2011, Toy made a payment of $450.00 that he designated was for a property of Integra 3150 and $350.00 for a property he designated 6923. See *Id.*

225. In September of 2011, Toy withdrew a total of $8,500.00 in personal draws to himself from the Kaheel bank account. See Ex. P36-38.

226. In September of 2011, Toy paid $350.00 for an inspection of the 6964 property and $180.00 for a 1028 property from the Kaheel bank account. See Ex. P36-38.

227. In September of 2011, Toy paid $ 5405.16 for work done on and utilities for the 434 N. Fulton St. property from the Kaheel bank account. See Ex. P36-38.

228. In September of 2011, Toy paid $32.42 for a water bill for the 926 W. Chew St. property from the Kaheel bank account. See *Id.*

229. In September of 2011, Toy paid his attorney a total of $500.00 and paid car insurance in the amount of $429.66 from the Kaheel bank account. See *Id.*

230. In October of 2011, Toy withdrew a total of $12,200.00 in personal draws for himself from the Kaheel bank account. Additionally, Toy withdrew money for various lunches, dinners, golf outings, and Wal-Mart from the Kaheel bank account. See *Id.*

231. In October of 2011, Toy paid $26.64 in utilities for the 434 N. Fulton St. Property from the Kaheel bank account. See *Id.*

232. On October 12, 2011, Jabrier Co, LLC and Marco Derro signed the agreement of sale for the Jefferson House Property. See Ex. P30.

233. In November of 2011, Toy withdrew a total of $11,009.95 in personal draws to himself from the Kaheel bank account as well as numerous lunches and gas expenditures. See Ex. P36-P38.

234. Toy admitted that one of the personal draws in the amount of $309.95 was to pay his personal credit card bill. See N.T., 10/22/2015, at 160:1-9.

42

235. In November of 2011, Toy paid $483.01 to Home Depot for supplies for the 434 N. Fulton St. Property from the Kaheel bank account. See Ex.P 36-P38.

236. In November of 2011, Toy paid for his car registration of $49.00 from the Kaheel bank account. See *Id.*

237. In December of 2011, Toy withdrew a total of $700.00 in personal draws to himself from the Kaheel bank account and made numerous lunch, breakfast, and gas expenditures from the Kaheel bank account. See *Id.*

238. In December of 2011, Toy paid Dunetz a $2500.00 interest payment from the Kaheel bank account. See *Id.*

239. In December of 2011, Toy spent $31.76 at Lowes for supplies for the 434 N. Fulton St. property from the Kaheel bank account. See *Id.*

240. Thus in 2011, Toy paid himself roughly a total of $90,652.30 in personal owners draws from the Kaheel bank account, not including the car expenses, lunches and dinners, office supplies, a trip to Florida and purchase of the 1400 Gandy Blvd property in Florida.

241. Jabrier's Profit or Loss Tax Schedule C for 2011 records income of $69,000.00 less the cost of goods sold of $54,713.00 leaving a gross profit of $14,287.00. See Ex. P48.

242. Jabrier's 2011 Tax Return lists car and truck expenses of $4,399.00 even though Kaheel paid all the car related expenses for 2011. See N.T., 10/22/2015, at 192:7-196:19; Ex.P48.

243. Jabrier's 2011 Tax Return also lists legal and professional services of $625.00, office expense of $285.00, supplies of $1,136.00, deductible meals and entertainment of $54.00, and other expenses of $3,685.00 leaving a tentative net profit of $4,068.00. See Ex. P48.

244. The Jabrier 2011 Tax Return lists all investment at risk. *Id.*

43

245. The Jabrier 2011 Tax Return lists the inventory at the beginning of the year as $247,569.00 and the inventory at the end of the year as $215,161.00. *Id.*

246. The Kaheel 2011 Profit or Loss Tax Schedule C for 2011 records income of $0.00, with a $21,196.00 loss listing zero for car and truck expenses. *Id.*

247. The Kaheel 2011 Tax Return lists expenses of $231.00 in deprecation, $3,686.00 in insurance, $3,008.00 for legal and professional services, $892.00 in office expenses, $128.00 in repairs and maintenance, $1,369.00 for travel, $1,182.00 for deductible meals and entertainment, $6,325.00 in utilities, $228.00 in bank service charges, $779.00 in gifts, $700.00 in inspections, $1,744.00 in miscellaneous expenses, $474.00 in storage expenses, and $450.00 in forfeited deposits. See *Id.*

248. Kaheel's bank checking ledger ends in December of 2011 with a beginning balance on December 31, 2011 of $85.22 in the Kaheel checking account. See Ex. P36-38.

249. Within twenty-one months of Triangle and Duggan Real Estate Investment's initial $300,000.00 investment, Toy had paid himself roughly $178,884.00 in personal draws from the Kaheel bank account, not including the money withdrawn to purchase the 1400 Gandy Blvd. Property in Florida.

## 2012

250. On March 15, 2012, Toy sold the 3128 Hartville St. Property for $1.00 to John Burkitt; Kaheel paid $668.10 in settlement costs for the sale. See Ex. P29.

251. At the time of the sale, Kaheel had paid $31,069.91 for the purchase, renovation, and resale of the 3128 Hartville St. Property and retained a $75,000.00 mortgage on the property.

252. On March 16, 2012, Dunetz files the initial Complaint in this matter.

44

253. Mr. Toy created new LLC's after receiving the complaint to continue his real estate endeavors.

254. In September of 2012, Kaheel's bank account has a ledger balance of -$295.18. See Ex. P37.

255. Jabrier's 2012 Profit or Loss from Business Schedule C Form lists income from sales of $77,420.00 for 2012 with the cost of goods sold listed as $50, 075.00 leaving a gross profit of $27,345.00. See Ex. P.49.

256. Jabrier's 2012 Tax Return lists expenses in the amount of $1,113.00 leaving a tentative net profit of $26, 232.00 and lists all investment at risk. See Ex. P49.

257. Jabrier's 2012 Tax Return lists the beginning inventory of $215,161.00 and the remaining inventory at the end of the year of $50,075.00. See *Id.*

258. Kaheel's 2012 Profit or Loss from Business Schedule C lists zero income for 2012 with a tentative loss of $2,254.00 from expenses. See *Id.*

## 2013

259. On September 17, 2013, the 1400 Gandy Blvd. N. #716 property is sold to Stephen Burgess from Terrey for $27,774.48 for an estimated profit of $13,504.83, this money is not deposited into the Kaheel bank account. See Ex. P32.

## 2015

260. In February of 2015, the 926 W. Chew St. Property is sold at a sheriff's sale for back taxes.

261. As of December of 2012, Kaheel had paid roughly $62, 434.04 in purchasing and renovating the 926 W. Chest St. Property from the Kaheel bank account and held a $90,000.00 mortgage on the property.

45

262. In July of 2015, the 434 N. Fulton St. Property was listed to be sold at a sheriff's sale for back taxes.

263. As of December of 2012, Kaheel had paid roughly $89,800.56 in purchasing and renovating the 434 N. Fulton St. Property from the Kaheel bank account and held an $80,000.00 mortgage on the property.

264. In August of 2015, on the eve of trial Jabrier filed bankruptcy.

## DISCUSSION

Prior to trial, Defendants had filed a Motion in Limine to Plaintiff's Exhibit 2, the Acknowledgement of the Receipt of Funds from Kaheel to Triangle, arguing that it should be precluded as the acknowledgment "was after the formation of the actual agreement and therefore is irrelevant to the proceedings." See N.T., 10/22/15, at 81:8-11. However, the Acknowledgement was created solely by Toy and signed by him as member of Kaheel and was sent to Plaintiff and certainly exposes the minimum agreement that Toy believed existed on April 2, 2010. The Court overruled the objection to the admission of Plaintiffs' Exhibit 2, but stated that Defendants argument would go to the weight that the Court would give to the Acknowledgment. See N.T., 10/22/2015, at 81:12-13.

As only two witnesses testified at trial this Court's judgment of the witnesses' credibility factors heavily into the resolution of this matter. The Court found Dunetz to be naïve and avaricious, but generally honest in his testimony. Thus, the Court found Dunetz's testimony to be credible on most points. In contrast, the Court found Toy to be shrewd, giving calculated and rehearsed testimony, revealing a wolf hiding in sheep's clothing. The Court found Toy's testimony to be lacking credibility on most points.

One preliminary issue for the Court to consider in this case is whether or not to pierce the corporate veils to hold Herbert J. Toy, III personally liable for the debts and actions of Kaheel and Terrey. At the outset, the Court notes that there exists a strong presumption against piercing the corporate veil.[1] *Advanced Telephone Systems, Inc. v. Com-Net Professional Mobile Radio, LLC.*, 846 A.2d 1264, 1277 (Pa. Super. 2004); *Wedner v. Unemployment Board*, 296 A.2d 792, 794 (Pa. 1972). As stated by the Third Circuit in *Zubik v. Zubik*, "[a]ny court must start from the general rule that the corporate entity should be recognized and upheld, unless specific, unusual circumstances call for an exception....Care should be taken on all occasions to avoid making the entire theory of corporate entity useless." 384 F.2d 267, 273 (3d. Cir. 1967). However, "a court will not hesitate to treat as identical the corporation and the individuals owning all its stocks and assets whenever justice and public policy demand and when the rights of innocent parties are not prejudiced thereby nor the theory of corporate entity made useless." *Good v. Holstein*, 787 A.2d 426, 430 (Pa. Super. 2001).

The general standard for piercing the corporate veil is as follows:

> The legal fiction that a corporation is a legal entity separate and distinct from its shareholders was designed to serve convenience and justice,...and will be disregarded whenever justice or public policy require and where the rights of innocent parties are not prejudiced nor the theory of the corporate entity rendered useless...We have said that whenever one in control of a corporate entity uses that control, or uses the corporate assets to further his or her own personal interests, the fiction of the separate corporate identity may properly be disregarded.

*Ashley v. Ashley*, 393 A.2d 637, 641 (Pa. 1978).

Factors to be considered in piercing the corporate veil are "undercapitalization, failure to adhere to corporate formalities, substantial intermingling of corporate and personal affairs, and use of the corporate form to perpetuate a fraud." *Dep't of Environmental Resources v. Peggs Run*

---

[1] Pennsylvania's LLC statute, provides that, "members of a limited liability company shall not be liable, solely by reason of being a member, under an order of court or in any other manner for a debt, obligation or liability of the company of any kind,...." 15 Pa. C.S.A. §8922 (a).

47

*Coal Co.*, 423 A.2d 765, 768-69 (Pa. Cmwlth. 1980); *Lumax Industries, Inc. v. Aultman*, 669 A.2d 893, 895 (Pa. 1995). A corporate veil may be pierced under the "alter ego" theory "when the individual or corporate owner controls the corporation to be pierced and the controlling owner is to be held liable…and one party seeks to hold the corporation owner liable for any claim or debt." *Good*, 787 A.2d at 430; see also *Village at Camelback Property Owner's Assn., Inc.*, 538 A.2d 528, 533 (Pa. Super. 1988)("Thus, we inquire…, whether corporate formalities have been observed and corporate records kept, whether officers and directors other than the dominant shareholder himself actually function, and whether the dominant shareholder has used the assets of the corporation as if they were his own.").

Here Plaintiffs have demonstrated that Defendant Herbert J. Toy, III is the sole Member and controlling manager of Defendants, Kaheel, Jabrier, and Terrey. Toy testified that he is the "sole member" of Defendants and that he never transferred any interest any of the defendant companies to anyone else. As sole member, Defendant Toy admitted to total control of the finances, policy and business practices of the defendant business entities. There are no officer and directors beyond Toy, the controlling member and shareholder. Neither Terrey, Kaheel, nor Jabrier paid dividends in the regular and ordinary course of their business. Toy, both individually and in his capacity as sole member of the defendant entities, induced Dunetz to invest $250,000.00 through false and misleading statements about the number of other investors he had for Kaheel and through the false promise, that Toy would be investing $250,000.00 of his own money into Kaheel. Toy made these statements while knowing that Kaheel was undercapitalized with an account balance of zero and no current property holdings at the time Toy was inducing Dunetz to invest.

Moreover, the evidence at trial demonstrated that Toy invested roughly $178,884.00 of Kaheel's corporate assets in personal draws to himself over nineteen months while investing roughly only $227,101.21 over that same time-period in the purchase, renovation, and re-sale of real properties for Jabrier. Toy failed to protect the assets of Kaheel and Jabrier by failing to pay the taxes on the properties that he purchased when he had the money to do so, with the result being that two of the properties were ultimately sold at sheriff's sales for failure to pay back taxes. Toy treated Kaheel, Jabrier, and Terrey as an Alter Ego of himself and often treated the Kaheel bank account as his own personal piggy bank going so far as to pay his personal credit card from the Kaheel bank account one month. Toy did not conduct any arms length transactions between Kaheel and Jabrier, using Kaheel funds to purchase and renovate Jabrier properties with only a paper mortgage listing an arbitrary amount, more than Kaheel spent on the properties, as a security interest. No monthly payments were made under the mortgages and Kaheel never foreclosed on any of the Jabrier properties after the time for repayment of the mortgages expired.

Defendant Kaheel has been defrauded of its assets. Toy used the Kaheel bank account to fund his airfare, hotel, and other costs as he went to Florida to investigate the 1400 N. Gandy Blvd. Property. Toy then withdrew a substantial sum of money, $16,457.65, from the Kaheel bank account for the purchase of the Florida property, which he titled in the name of Terrey. Toy did not create any mortgage between Terrey and Kaheel for the purchase of the property. Toy did not deposit the proceeds of the sale of the Florida property in Kaheel's bank account. Toy simply claimed at trial that the $16,457.65 was removed from the Kaheel bank account as a personal draw without any obligation of repayment, even though the amount was not listed as a personal draw "HJT3" in the Kaheel check ledger but rather as "Purchase 717."

49

Reviewing the tax returns for Jabrier and Kaheel from 2010-2012, the bank statements for Kaheel, and the check ledgers for the Kaheel bank account and Toy's own testimony makes it abundantly clear that corporate formalities have not been observed and that funds have been comingled between Kaheel, Terrey, and Jabrier. For example, Toy purchased an automobile that he used for all three companies, Kaheel, Terrey, and Jabrier, yet he paid for the car, the car insurance, and all the gas and automobile repairs from Kaheel's bank account. He claimed car business expenses in 2010 on the Kaheel Tax Return and then despite all the gas, insurance, etc. being paid from the Kaheel bank account, claimed the car business expenses on the Jabrier tax return for 2011. Toy used the Kaheel bank account to pay for a storage unit that housed equipment, even though Kaheel was to be solely the "financing entity." Toy used the Kaheel bank account to pay the cable bill and other office expenses for Toy when the office housed all three companies. As was recited in the finding of fact section above, many of Toy's own personal expenses were paid for directly out of Kaheel's bank account. Toy did not keep proper accounts, and he did not even continue the façade by maintaining even a minimal business checking ledger for Kaheel in 2012.

Based upon the undercapitalization, failure to adhere to corporate formalities, substantial intermingling of corporate and personal affairs and use of the corporate form to perpetrate fraud, this Court holds that it is appropriate to pierce the corporate veils of Kaheel and Terrey and hold Toy personally liable for any counts of Plaintiffs' Complaint for which Defendants are found liable.

A second preliminary question is whether Plaintiff, Howard M. Dunetz, is able to recover on any theory when it is undisputed that the $250,000.00 investment was tendered by Plaintiff, Triangle Home Invest, LLC, and the check was signed by Dunetz in his capacity as member of

Triangle. Plaintiffs are seeking the "sum of $235,000.00 plus all lost profits, interest, costs and attorney fees." See Pls. Amend. 3rd Compl. None of Plaintiffs' claims have to do with money or time or work expended by Dunetz as an individual, but only deal with the handling by the Defendants of the $250,000.00 investment from Triangle. Thus, the Court will find in favor of the Defendants and against Plaintiff, Howard M. Dunetz, on all counts.

### Count One-Breach of Contract

In order "[t]o maintain a cause of action in breach of contract, a plaintiff must establish: (1) the existence of a contract, including its essential terms; (2) a breach of a duty imposed by the contract; and (3) resulting damages." *Lackner v. Glosser*, 892 A.2d 21, 24 (Pa. Super. 2006). Moreover, "[a]n offer to contract must be intentional and sufficiently definite in its terms, and no offer will be found to exist where its essential terms are unclear." *Beaver Valley Alby Foundary Co. v. Therm a-Fab, Inc.*, 814 A.2d 217, 222 (Pa. Super. 2002). Further, "[t]he touchstone of any valid contract is mutual assent and consideration." *Bair v. Manor Care of Elizabethtown, PA, LLC*, 108 A.3d 94, 96 (Pa. Super. 2015). As to its breach of contract claim, Plaintiffs have the burden of proving a contractual relationship with Defendants. *Telwell, Inc. v. Grandbridge Real Estate Capital, LLC*, 143 A.3d 421, 427 (Pa. Super. 2016).

In Count One of their third Amended Complaint, Plaintiffs allege breach of contract against Kaheel, but in the wherefore clause ask for judgment against "Defendants." Pls. Third Amend. Compl., ¶29. In their Proposed Findings of Fact and Conclusions of Law, Plaintiffs focus solely on Kaheel's breach of the alleged oral contract, and do not appear to be trying to hold the other Defendants beside Kaheel and Toy liable for a breach of contract. See Plaintiffs' Proposed Findings of Fact and Conclusions of Law, ¶ 6-10. The record contains no evidence that Terrey was a party to any alleged oral contract between Triangle and Kaheel. Thus the Court

51

will find in favor of Defendant Terrey against Plaintiffs for the sum of zero dollars on Count One breach of contract claim.

Plaintiffs urge this Court to find the existence of an oral contract where in exchange for the investment of $250,000.00 Triangle would receive "investment returns of fifty percent (50%) to one hundred percent (100%), that net profits would be split equally between Toy and Triangle, with each receiving fifty percent (50%) of the profits, and that Triangle would receive four percent (4%) interest annually on its initial investment, with one percent (1%) interest quarterly." Pls. Proposed Findings of Fact, ¶56. Plaintiff would further have this Court find that Triangle's investment was "to be used solely to purchase, renovate, and sell properties and that Kaheel was to use the $250,000.00 to fund real estate transactions" and that Kaheel was to "provide a security interest to Triangle in the amount invested in any properties which are purchased by Kaheel utilizing Triangle's investment." Id. at ¶50, ¶58. Plaintiffs argue that the Acknowledgment of Receipt of Investment Funds was an affirmation of the oral contract. Id. at ¶5.

Plaintiffs allege that Kaheel breached the terms of the oral contract by: "(1) failing to split profits equally with Plaintiffs, (ii) failing to provide Triangle with a mortgage or note on any of the properties Kaheel purchased instead placing the properties in Jabrier's name, (iii) failing to acquire any of the properties with equal amounts of Toy's and Triangle's funds, and (iv) not paying any quarterly interest payments to Dunetz after December of 2011." Id. at ¶ 7. Plaintiffs further allege that even the use of the $250,000.00 to pay business expenses of Kaheel was a breach of the contract as the money was to be used only for the purchase, renovation, and resale of properties. Id. at 10.

52

However, while it is clear that the $250,000.00 investment from Triangle to Kaheel was not a gift, it does not appear that there ever existed a meeting of minds on the essential terms of the contract. The April 2, 2010, Acknowledgement of Receipt of Investment Funds certainly reflects a minimal understanding of the terms Toy believed Kaheel had received the investment subject too. However, the Acknowledgement makes no mention of any $2500.00 quarterly interest payments, that Kaheel in fact made to Triangle throughout 2010 and 2011 and Triangle accepted as though they were part of the agreement. Moreover, Plaintiff Dunetz testified that, in response to the question about whether on April 1, 2010, there was a deal between Toy and Dunetz, "[w]e had a transferring of money. Until I had that agreement, I really didn't know what the deal was. So did we have a deal without an agreement? I'm not sure." See N.T., 8/13/15, at 44:14:17. Dunetz also testified that he had not placed any restrictions on Mr. Toy's use of the money except to "make me money." See Pls. Ex. 54, P.23-24. Dunetz did not know when the quarterly interest payments were to be made, although he and Toy both agreed that the profits on the properties bought with the Kaheel investment were to be split, Dunetz was unaware of whether the disbursements of those properties would be at the time of the sale of the properties or annually. Dunetz was unsure of the timing of the annual renewal of the agreement as to whether the parties wanted to continue working together. Toy alleged, in 2012, after Dunetz asked for a note to secure the agreement and for a large portion of the principal investment back, that the $250,000.00 had been given to Kaheel as a twenty-year loan with 4% annual interest payments. Dunetz testified credibly that he would never have tendered the $250,000.00 to Kaheel had the twenty-year loan been his understanding of the deal. Although the 2010 Acknowledgment of Receipt of Investment Funds demonstrates that the parties were working towards a contract for the investment funds, the Plaintiff did not prove by a preponderance of the

53

evidence the essential terms of the contract and did not demonstrate mutual assent to the terms of the contract. Thus, the Court finds in favor of the Defendants Kaheel and Toy in the sum of zero dollars on Count One, Breach of Contract.

### Count Two- Unjust Enrichment

Initially, the Court notes that a finding of unjust enrichment is appropriate, "only when a transaction is not subject to ...a contract." *Northeastern Fence & Iron Works, Inc. v. Murphy Quigley Co., Inc.*, 933 A.2d 664, 669 (Pa. Super. 2007); see also *Stoeckinger v. Presidential Financial Corp.*, 948 A.2d 848 (Pa. Super. 2008)("Either there is a contract and a claim for breach of contract; or there is no contract but rather a quasi-contract implied by the law and a claim for unjust enrichment. Even though these two counts are duplicative and a plaintiff cannot recover on both theories, a plaintiff may plead in the alternative."). In Count One, this Court found that there was no meeting of the minds in terms of the essential contract terms in exchange for the investment of the $250,000.00. However, Toy and Kaheel admit to receiving and retaining $250,000.00 of Plaintiff Triangle's funds and denied giving Plaintiffs any ownership interest in any of the Defendant Entities or repaying the alleged twenty-year loan. As the Court has found that there was no contract between Plaintiff Triangle and Defendants, a finding of unjust enrichment is permissible.

As discussed by the Pennsylvania Superior Court in *Durst v. Milroy General Contracting, Inc.*,

> Where unjust enrichment is found, the law implies a contract, which requires the defendant to pay to the plaintiff the value of the benefit conferred. *Schenck v. K.E. David, Ltd.*, 446 Pa.Super. 94, 666 A.2d 327 (1995). The elements necessary to prove unjust enrichment are:
>> (1) benefits conferred on defendant by plaintiff; (2) appreciation of such benefits by defendant; and (3) acceptance and retention of such benefits under such circumstances that it would be inequitable for defendant to retain the benefit without payment of value. (citations omitted). The

54

application of the doctrine depends on the particular factual circumstances of the case at issue. In determining if the doctrine applies, our focus is not on the intention of the parties, but rather on whether the defendant has been unjustly enriched.

*Id.,* 666 A.2d at 328. *Accord Torchia v. Torchia,* 346 Pa.Super. 229, 499 A.2d 581, 582 (1985) ("[t]o sustain a claim of unjust enrichment, a claimant must show that the party against whom recovery is sought either 'wrongfully secured or passively received a benefit that it would be unconscionable for her to retain.'") (citation omitted). *Mitchell v. Moore,* 729 A.2d 1200, 1203–04 (Pa.Super.1999).

52 A.3d 357, 360 (Pa. Super. 2012). An action based on unjust enrichment sounds in quasi-contract, which "imposes a duty, not as a result of any agreement, whether express or implied, but in spite of the absence of an agreement, when one party receives unjust enrichment at the expense of the other." *Northeastern Fence & Iron Works, Inc.,* 933 A.2d at 688-689. Importantly, in determining an unjust enrichment claim the Court is to focus "not on the intention of the parties, but rather on whether the defendant has been unjustly enriched." *Id.* at 688-689. When the doctrine of unjust enrichment is found to apply, the person "who has been unjustly enriched at the expense of the other must make restitution to the other." *Wilson Area School Dist. v. Skepton,* 895 A.2d 1250, 1254 (Pa. 2006).

In this case, Plaintiff Triangle proved all the elements of unjust enrichment by a preponderance of the evidence. First, benefits were clearly conferred on Toy and Kaheel when Triangle tendered $250,000.00 to Kaheel, of which only $12,500.00 was returned to Triangle. Defendants admitted that the $250,000.00 received from Triangle was not a gift and under Defendants theory, payments would still be due and owing to Triangle, as Defendants characterized the $250,000.00 as a twenty-year loan with annual interest of 4% with quarterly interest payments to be made. Defendants have made no "quarterly interest payments" on the alleged loan since December of 2011. Thus, Defendants have been enriched by $237,500.00 by retaining the funds and failing to make any interest payments and by failing to comply with the

55

terms of the acknowledgement which Toy provided to Triangle on April 2, 2010, containing his minimum understanding of the agreement between the two parties. The acknowledgement read as follows:

> This ACKNOWLEDGEMENT confirms and acknowledges the receipt by Kaheel Company, LLC of the total sum of Two Hundred Fifty Thousand Dollars ($250,000.00) received from Triangle Home Invest, LLC. Kaheel Company, LLC acknowledges that the Two Hundred Fifty Thousand Dollars ($250,000.00) received from Triangle Home Invest, LLC is to be utilized by Kaheel Company, LLC or its designee/assignee to purchase real property for investment purposes. The terms and conditions of said investment are to be outlined in another agreement be[sic.] prepared in the near future. Kaheel Company, LLC agrees that it will provide a security interest to Triangle Homes Invest, LLC in the appropriate amount invested in any property(ies) which are purchased by Kaheel Company, LLC utilizing the funds received as acknowledged herein.

Pl.'s Reply to New Matter, P. 2. Plaintiff Triangle was never provided with a security interest in any of the properties purchased by Kaheel utilizing the funds received from Triangle.

Secondly, Defendants Kaheel and Toy appreciated the benefits of the $237,500.00 conferred on them by Triangle. Defendant Kaheel received the money and appreciated the benefit of it, by among other things, purchasing and renovating and selling for a profit the 5230 Heston St. property, without providing any security interest to Triangle and without providing any of the proceeds of the sale of the property to Triangle. Defendant Kaheel had a checking account balance of zero when it received the $250,000.00 investment from Triangle. Thus Kaheel appreciated the benefit of being able to pay for its operating and business expenses from the investment from Triangle. Kaheel appreciated the benefit of purchasing and renovating the 926 W. Chew St. property, the 434 North Fulton St. property, and the 3128 Hartsville St. property with the investment funds, without providing Triangle a security interest in said properties although ultimately the properties resulted in a loss for Kaheel. Defendant Toy appreciated a benefit from the $250,000.00 investment by Triangle, in the amount of

56

$178,884.00, taken as personal draws, as perhaps a "salary" over twenty-one months from 2010 to 2012. Toy also appreciated a benefit from withdrawing $16,457.64 from the Kaheel bank account to purchase the 1400 W. Gandy Blvd property which he titled in another of his companies that he was the sole owner of, Terrey, and he later sold said property for roughly a $13,000.00 profit which he did not share with Triangle or Kaheel. Additionally, Toy received the benefit of the $250,000.00 investment as he used the Kaheel bank account to purchase an automobile that he drove on behalf of several of his businesses, paid for the gas in the car, the car insurance, office expenses for three businesses, storage, trips to see real estate, numerous breakfasts, lunches, dinners, holiday gifts, and to pay off his credit card.

Lastly, in this case it would be inequitable for Defendants Toy and Kaheel to accept and retain the benefits from the $250,000.00 investment without the payment of value. There was no meeting of minds over the specific terms of the investment. However, Triangle tendered $250,000.00 and received no benefit for their investment aside from the return of $12,500.00 of the funds. Dunetz admittedly has received and retained $28,000.00 from the Jefferson House Property transaction in December of 2011. However, the Defendants did not file a counterclaim in this matter, and at trial the parties testified that this matter is the subject of a lawsuit in Northampton County. Under the circumstances, it would be inequitable for Defendants to accept and retain the benefits they received without returning $237,500.00 to Plaintiff Triangle. Thus, the Court will enter a verdict in favor of Plaintiff Triangle for $237,500.00 and against Defendant Toy and Defendant Kaheel.

### Count Three-Intentional and Fraudulent Misrepresentation

The theory of fraudulent misrepresentation flows from the "societal duty not to affirmatively mislead or advise without factual basis." *Bruno v. Erie Ins. Co.*, 106 A.3d 48, 58

57

(Pa. 2014). Fraudulent misrepresentation "constitutes a breach of [the] duty of honesty imposed by society, and not contractual duties." *Mendelsohn, Drucker v. Titan Atlas M. fg.,* 885 F. Supp. 2d 767, 790 (E.D. PA. 2012). As stated by the Pennsylvania Supreme Court in *Bortz v. Noon,* the elements of intentional misrepresentation are:

> 1) A representation;
> (2) which is material to the transaction at hand;
> (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false;
> (4) with the intent of misleading another into relying on it;
> (5) justifiable reliance on the misrepresentation; and,
> (6) the resulting injury was proximately caused by the reliance.
> *Gibbs v. Ernst,* 538 Pa. 193, 207, 647 A.2d 882, 889 (1994), *citing,* Restatement (Second) of Torts § 525 (1977)

*Bortz v. Noon,* 729 A.2d 555, 560 (Pa. 1999). As was highlighted by the Pennsylvania Superior Court in *Ira G. Steffy & Son, Inc. v. Citizens Bank of Pennsylvania,* "[s]center, or the maker's knowledge of the untrue character of his representation, is a key element in finding fraudulent misrepresentation." 7 A.3d 278 (Pa. Super. 2010); *citing* Restatement (Second) of Torts §526, Commenta. A "misrepresentation is material if the party would not have entered into the agreement, but for the misrepresentation." *Eigen v. Textron Lycoming Reciprocating Engine Div.,* 874 A.2d 1179, (Pa. Super. 2005). However, "[o]ne deceived need not prove that fraudulent misrepresentation was the sole inducement to the investment of money, a material inducement is sufficient." *Silverman v. Bell Sav. & Loan Assn.,* 533 A.2d 110, 113 (Pa. Super. 1987). Under Pennsylvania law, fraud must be proven by clear and convincing evidence. See *Sewak v. Lockhart,* 699 A.2d 755, 759 (Pa. Super. 1997).

Defendants argue that "Dunetz and Triangle were not entitled to rely upon mere matters of opinion as to the potential return on the loan." Defs.' Proposed Conclusions of Law, ¶6 citing *Binns v. Copper Range Co.,* 6 A.2d 895 (Pa. 1939). Defendants also assert that "[t]he breach of a

promise to do something in the future is not actionable in fraud." See Defs.' Proposed Conclusions of Law, ¶5 citing, *Ira G. Steffy and Son, Inc. v. Citizens Bank of Pennsylvania*, 7 A.3d 278 (Pa. 2010). Plaintiffs allege in their Third Amended Complaint that the representations made by Toy, in his individual capacity, and as an agent of Kaheel, to Dunetz, in his capacity as an agent of Triangle, were that: "Toy indicated to Dunetz that he could invest the sum of $250,000.00 with Kaheel, and that money would in turn be invested into residential properties with profit sums being returned to Dunetz. Toy claimed anticipated investment returns of fifty percent (50%) to one hundred percent (100%). The returns to be directed to Dunetz were to be fifty percent (50%) of any profit from the purchase and sale of the properties." Pls.' 3rd. Amend. Compl., ¶42.

This Court agrees with Defendants in that Plaintiffs were not entitled to rely on Toy's opinion that the anticipated investment returns would be 50% to 100% or as Dunetz testified on the stand that the investment returns would be "50% to infinity." It has long been held that, "a buyer or seller is not entitled to rely on mere statements of opinion as to value or puffery where the person to whom these opinions are made has an equal opportunity to ascertain the facts affecting the value of the thing to be bought or sold." 2 Summ.Pa.Jur.2d Torts §16.5 (2d. ed. 2016), citing, *Binns v. Copper Range Co.*, 6 A.2d 895 (Pa. 1939) and *Huddleston v. Infertility Center of America, Inc.*, 700 A.2d 453 (Pa. Super. 1997). Pursuant to Pennsylvania law, "the recipient of an allegedly fraudulent misrepresentation is under no duty to investigate its falsity in order to justifiably rely." *Toy v. Metro. Life Ins. Co.*, 928 A.2d 186, 207 (Pa. 2007). Nonetheless, "a party is unjustified in relying on a misrepresentation if it knows the representation is false or if its falsity is obvious." *Berger v. Cushman & Wakefield of Pennsylvania Inc.*, 2014 WL 2892408 (E.D. Pa. 2014)(internal citations omitted).

59

Representations that the return on an investment will be fifty percent to infinity is an obvious statement of commercial puffery, a "mere assertion of value" with "no warranty [...] intended." *Binns*, 6 A.2d at 898, see also *Berkebile v. Brantly Helicopter Corp.*, 337 A.2d 893 (Pa. 1975).

During Trial, Dunetz testified about two other representations made by Toy that he relied upon in making his decision to have Triangle invest money with Kaheel. First, Dunetz's understanding was that he and Toy would initially invest an equal amount of money, $250,000.00, the money would then be assigned to the purchases and fixing up and selling of "a particular house or apartment building or a package of houses." See N.T., 8/13/15, at 16:9-18:11. Secondly, Dunetz credibly testified that Toy, had originally informed Dunetz that he had a number of other investors in Kaheel that functioned as silent partners in his business. The investors gave Toy cash, and in return received 4% returns on their investment and 50% of the profits from their investment. See N.T., 8/13/2015, at 31:4-8. Thirdly, Dunetz credibly testified at his deposition that Toy represented to him that there "was always four to five other investors with a total contribution of 650 to 750 thousand dollars." *Id.*, P.17.

As to Dunetz's understanding that he and Toy would initially invest an equal amount of money $250,000.00, and that the money would be assigned to the purchase and fixing up and selling of particular houses, "[i]t is well established that the breach of a promise to do something in the future is not actionable in fraud." *Shoemaker v. Commonwealth Bank*, 700 A.2d 1003, 1006 (Pa. Super. 1997). Toy's promise to also invest an equal amount of $250,000.00 is not actionable as a fraudulent misrepresentation.

However, Toy did make representations that were material to the transaction at hand to Dunetz about having a number of other investors in Kaheel that functioned as silent partners in his business, whom received 4% returns on their investment and 50% of the profits from the

*[handwritten margin note: no testimony that he relied upon this]*

60

investment and that there was always four to five other investors with a total contribution of 650 to 750 thousand dollars. These representations were material misrepresentations, as they were a material inducement to Dunetz handing Toy the $250,000.00 check. These statements were false and Toy knew them to be false as he admitted that at the time he was making the statements to Dunetz, neither Kaheel, Jabrier, or Terrey had owned any property since 2008, he was unemployed, and Kaheel's bank account was zero. He knew there were no other investors or a total contribution of $650,000.00 to $750,000.00. Toy was aware that he needed the money from Triangle's investment for his own expenses and the business expenses of Kaheel, instead of using it solely to purchase real property as the Acknowledgment of the Receipt of Investment Funds that Toy sent to Triangle indicated.

The intent to mislead can be inferred by Toy's actions of sending an acknowledgment of the receipt of the funds without following up with any further documents and immediately taking a $10,000.00 personal draw from the funds the day that Triangle's check cleared the bank. Lastly, "to be justifiable, reliance upon the representation of another must be reasonable." *Porreco v. Porreco*, 811 A.2d 566, 571 (Pa. 2002). While opinions that are mere puffery are not justifiable for someone to rely on, Dunetz was not required to make an independent investigation into the truth of the representations as to the existence of six or seven other investors and the bank account. The falsity of these representations was not obvious. The Court finds Dunetz's reliance on Toy's statements about other investors, the returns given to them, and the amount of the other investors investment reasonable.

The fraudulent misrepresentations proximately caused economic harm in that Triangle tendered to Toy $250,000.00 and received in return only $12,500.00. The proper measure of

61

damages for fraudulent misrepresentation as summarized in the Pennsylvania Suggested

Standard Civil Jury Instruction 17.270 is:

> The plaintiff is entitled to be fairly and adequately compensated for the actual monetary loss [he] [she] has suffered.
>
> Actual monetary loss includes:
> 1. the difference between the value [he] [she] gave or amount [he] [she] paid and the actual, real, or intrinsic value of what [he] [she] received at the time of the transaction; and.
> 2. all other monetary loss suffered as a consequence of the misrepresentation or nondisclosure, including the additional expenses and losses incurred as a result of the misrepresentation or nondisclosure, [but not including,] [and including, if the plaintiff is in the business of engaging in the type of transaction involved,] the profit the plaintiff [has shown to a reasonable certainty that [he] [she]] would have made.

Pa.S.S.C.J.I. 17.270 (4th ed. 2016 supplement).  Here Triangle suffered the loss of $237,500.00

and the resulting loss of the annual 4% quarterly interest payments Triangle was to receive while

Kaheel retained the investment funds which now totals $52,500.00.  The quarterly interest

payments are calculated as follows:

1. For the year 2011, two $2,500.00 payments are owed, for a total of $5,000.00.
2. For the year 2012, four $2,500.00 payments are owed for a total of $10,000.00.
3. For the year 2013, four $2,500.00 payments are owed for a total of $10,000.00.
4. For the year 2014, four $2,500.00 payments are owed for a total of $10,000.00.
5. For the year 2015, four $2,500.00 payments are owed for a total of $10,000.00.
6. For the year 2016, three $2,500.00 payments are owed for a total of $7,500.00.

See Pls. Proposed Findings of Fact and Conclusions of Law, ¶87.  Thus, the Court will find in

favor of Plaintiff Triangle and against Defendants Kaheel and Toy in the amount of $289,000.00

on Count Three Intentional and Fraudulent Misrepresentation.

### Count Four-Fraud

In Count Four, the Plaintiffs allege word for word the allegations listed in ¶40-¶56 under

Count Three-Intentional and Fraudulent Misrepresentation, with the single addition of paragraph

72 which states, "[a]s outlined above in paragraphs sixty-one (61) through (66) above, Toy,

62

directly and as an agent of the defendant corporations herein, made knowingly false statements to Dunetz concerning the investment and its likelihood of success." As this Count is wholly duplicative of Count Three, the Court will only permit recovery under the theory of fraudulent misrepresentation once and thus will dismiss Count Four.

### Count Five-Negligence

While Count Five is labeled "negligence" generally, the averments of Count Five in the Plaintiffs third amended complaint make clear that the Plaintiffs are pursuing recovery under Count Five based upon the theory of negligent misrepresentation. To recover for negligent misrepresentation, Plaintiffs must prove by a preponderance of the evidence that there was: "(1) a misrepresentation of a material fact; (2) made under circumstances in which the misrepresenter ought to have known its falsity; (3) with an intent to induce another to act on it; and (4) which results in injury to a party acting in justifiable reliance on the misrepresentation." *Bilt–Rite Contrs., Inc. v. Architectural Studio,* 581 Pa. 454, 866 A.2d 270, 277 (2005). As the Court has found for Plaintiff Triangle on Count Three –Intentional and Fraudulent Misrepresentation, and the evidence at trial demonstrated that Toy was aware of the falsity of the misrepresentations that he made to Dunetz, the alternate theory of negligent misrepresentation is disproven. See *Bortz v. Noon,* 729 A.2d at 561 (" The elements of negligent misrepresentation differ from intentional misrepresentation in that the misrepresentation must concern a material fact and the speaker need not know his or her words are untrue, but must have failed to make a reasonable investigation of the truth of these words.). Further, "[l]iability for negligent misrepresentation, as distinguished from a misrepresentation that is intentional or in reckless ignorance of the truth, is imposed only where a duty exists to give correct information." Pa. S.S.C.J.I. 17.240, Subcommittee Note

63

*citing Renn v. Provident Trust Co,* 196 A.8 (Pa. 1938). Thus, the Court will find in favor of

Defendants and against Plaintiff Triangle in the sum of zero dollars on Count 5, Negligence.

### Count Six-Conversion

As summarized by the Pennsylvania Superior Court in *Pittsburgh Const. Co. v. Griffith,*

> Conversion is a tort by which the defendant deprives the plaintiff of his
> right to a chattel or interferes with the plaintiff's use or possession of a
> chattel without the plaintiff's consent and without lawful justification.
> *Chrysler Credit Corporation v. Smith,* 434 Pa.Super. 429, 643 A.2d 1098,
> 1100 (1994), *appeal denied,* 539 Pa. 664, 652 A.2d 834 (1994). "A
> plaintiff has a cause of action in conversion if he or she had actual or
> constructive possession of a chattel at the time of the alleged conversion."
> *Id.* Money may be the subject of conversion. *Francis J. Bernhardt, III,
> P.C. v. Needleman,* 705 A.2d 875, 878 (Pa.Super.1997) (quoting
> *Shonberger v. Oswell,* 365 Pa.Super. 481, 530 A.2d 112, 114 (1987)).
> However, the failure to pay a debt is not conversion. *Id.*

834 A.2d 572, 581 (Pa. Super. 2003). The requisite intent is the "... intent to exercise dominion

or control over the goods which is in fact inconsistent with the plaintiff's rights ...." *Shonberger

v. Oswell,* 530 A.2d 112, 114 (Pa. Super. 1987). In *International Dairy Queen, Inc. v. Hill,* the

Pennsylvania Superior Court further explained that a conversion can be committed by: "(a)

Acquiring possession of the goods, with an intent to assert a right to them which is in fact

adverse to that of the owner. (b) Transferring the goods in a manner which deprives the owner of

control. (c) Unreasonably withholding possession from one who has the right to it. (d) Seriously

damaging or misusing the chattel in defiance of the owner's rights." 378 A.2d 977 (1977), citing

Prosser, Torts, §15 (2d ed. 1955). The law is clear "that the measure of damages for conversion

is the market value of the converted property at the time and place of the conversion." *L.B.

Foster Co. v. Charles Caracciolo Steel & Metal Yard, Inc.,* 777 A.2d 1090, 1096 (Pa. Super.

2001); see also *Northcraft v. Edward C. Michener Assoc., Inc.,* 466 A.2d 620, 628 (Pa. Super.

1983).

64

In April of 2011, Toy claimed that he took as a personal draw $16,457.65 from Kaheel's bank account which he used to purchase 1400 Gandy Blvd N.#716, St. Petersburg, FL as there was no resulting mortgage to Kaheel Company made and the property is deeded to Terrey instead of Jabrier. In Kaheel's bank ledger he lists these withdrawals not as personal draws ("HJT3") but rather as "purchase #716." See Ex. P35-P38; P31; See N.T., 10/22/2015, at 137:1-140:14. The Court finds this to be a conversion of Triangle's investment funds and Kaheel's funds designed to shield the profits from the Florida property from any of Kaheel's creditors, namely Triangle and Duggan Real Estate Investment, LLC. See Ex. P31. As a result of this transfer and purchase, Terrey acquired $16,457.65, but no resulting obligation to repay the funds to Kaheel or Triangle. Thus, Terrey and Toy converted the $16, 457.65 in which Triangle retained an ownership interest and a verdict will be entered in favor of Plaintiff Triangle in the amount of $16, 457.65 on Count Six, Conversion.

## CONCLUSIONS OF LAW

For all the foregoing reasons, this Court finds that Plaintiff Triangle has sustained total losses occasioned by Defendant Toy and Defendant Kaheel in the amount of $289,000.00. A verdict is entered on the Complaint in favor of Plaintiff Triangle and against Defendant Toy and Defendant Kaheel in the amount of $237,500.00 on Count Two-Unjust Enrichment. Moreover, Plaintiff has sustained further losses occasioned by Defendant Toy and Defendant Kaheel in the amount of $52,500.00 in the non-payment of the quarterly interest payments. Thus, a verdict is entered in favor of Plaintiff Triangle and against Defendant Toy and Defendant Kaheel in the amount of $ 289,000.00 on Count Three-Intentional and Fraudulent Misrepresentation. Count Four-Fraud of Plaintiff's Third Amended Complaint is hereby dismissed as duplicative. A verdict in favor of Defendants and against Plaintiff Triangle is entered in the sum of zero dollars

on Count Five-Negligence. This Court finds that Plaintiff Triangle has sustained losses caused by Defendant Toy and Defendant Terrey in the amount of $16,457.65. A verdict is entered on the Complaint in favor of Plaintiff Triangle and against Defendant Toy and Defendant Kaheel, in the amount of $16,457.65 on Count Six-Conversion. A verdict is entered on the Complaint in favor of Defendants and against Plaintiff Triangle on Count One-Breach of Contract. The total verdict owed to Plaintiff Triangle is $289,000.00 of which Defendant Terrey is only jointly and severally liable for $16,457.65. A verdict is entered in favor of Defendants and against Plaintiff Howard M. Dunetz on all counts.

Plaintiff Triangle is legally entitled to recover on multiple theories, but its recovery is not to be duplicated. Accordingly, any amounts recovered by Plaintiff Triangle on any one count shall be credited against any amount due under other counts where recovery was granted.

BY THE COURT:

_____
Michele A. Varricchio, J.